OPINION OF THE COURT
Joan S. Kohout, J.
A petition was filed by the Director of the Monroe County Department of Social Services on May 28, 1999 requesting the termination of parental rights of Alphonse B. regarding his son Chance, born August 31, 1996, based upon the alleged mental illness of the respondent.
Counsel was assigned for Mr. B. Mr. B. always appeared in court with his mother Ruth B. A Law Guardian was assigned for Chance.
A psychiatric evaluation was directed as required by Social Services Law § 384-b (6) (e), which was completed by court-appointed forensic psychiatrist, Rajendra P. Singh, M.D. Several adjournments were required to obtain the court-ordered evaluation.
The trial commenced on May 2, 2000 and continued on May 12, 2000. Shortly thereafter the court was informed that Mr. B.’s attorney was leaving her employment in the Monroe County Public Defenders Office and relocating outside of New York State. As a result, a new attorney was assigned to represent Mr. B. It was necessary for new counsel to review the transcripts of the two days of trial and to assess whether a motion would be made for a new trial. After substantial delay it was determined that the case could proceed and that no request for a new trial would be made by any party. The trial was finally completed on January 18, 2001 and permission given to all parties to submit written closing arguments and memoranda of law.
*628 Findings of Fact
Chance B. was bom to the respondent Alphonse B. and Cora S. on August 31, 1996. Chance presently lives in the foster care home of Willie and Ruth M., where he has lived for three years. Ms. M. is the respondent’s aunt. Chance has been in foster care continuously since his placement on February 7, 1997 as the result of a neglect petition filed against Mr. B.
In February 1999 Cora S. signed a surrender instrument consenting that Chance be adopted by the Ms. Chance’s brother, Poncho, lives with Ms. S. Ms. S. and Poncho visit with Chance on an informal basis, sometimes once or more per week.
Mr. B. suffered a brain injury on June 4, 1997 during an apparent suicide attempt while he was an inmate at the Monroe County Jail. As a result of oxygen deprivation to his brain, he experienced anoxic encephalopathy due to strangulation. Mr. B. was taken to St. Mary’s Hospital where he was initially admitted to the Intensive Care Unit. On June 17, 1997 Mr. B. was transferred to St. Mary’s Brain Injury Unit where he remained until his discharge on August 17, 1998. At the time of discharge, Dr. Tony M. Wong, Director of Neuropsychology, described Mr. B. as having long-term cognitive impairments with “significant impairments in memory and in certain front/ executive skills” (exhibit 3A, neuropsychology discharge summary).
Mr. B. resides with a roommate in a two-bedroom 24-hour supervised apartment. He is able to take care of himself with direction provided by a supervisor. He cooks, cleans, shops and attends a day program for individuals with brain injuries. Mr. B. visits with his family and sees his son regularly. During visitations Mr. B. plays with his son.
Mr. B.’s primary physician is Dr. Lisa Harris, an internist with special experience caring for patients with traumatic brain injuries. Dr. Harris stated that Mr. B. suffers from hypoxic encephalopathy,[1] which she described as a medical condition rather than a mental illness. This medical condition is the result of significant injuries to Mr. B.’s brain that affect his judgment, thinking and reasoning, as well as short-term memory. Due to the severity of his injury he is not presently able to care for his son. During her most recent visit with Mr. B. in October 2000 she noted some improvements in Mr. B.’s intellectual functioning and language use.
*629 Dr. Singh, the court-appointed, psychiatrist, testified that Mr. B. suffered from the psychiatric condition of dementia due to anoxia. This mental disease or condition seriously impairs Mr. B.’s judgment. Dr. Singh stated that the prognosis for future improvement is extremely poor and that Mr. B. was not capable of caring for his son. Dr. Singh stated that Chance would be at risk of harm because his father would not be able to supervise him or care for his basic needs. It was Dr. Singh’s opinion that Mr. B.’s condition would not improve for the foreseeable future, which in this case he determined to be the lifetime of the respondent.
The respondent presented testimony from neuropsychologist Tony M. Wong, Ph D, who treated Mr. B. at the St. Mary’s Brain Injury Unit and who prepared the discharge summary contained in the hospital records received in evidence as exhibit 3A. Dr. Wong is an expert in treating and assessing brain-injured patients. Dr. Wong again saw Mr. B. in January 2000 for further assessment at which time his medical diagnosis continued to be hypoxic or anoxic encephalopathy. Dr. Wong testified that he would not describe Mr. B.’s condition as dementia, as did Dr. Singh, and that such a diagnosis would be misleading since there are so many types of dementia. Additionally, Dr. Wong noted that dementia is a descriptive term for a constellation of symptoms, but does not address the cause of the symptoms. Dr. Wong clearly stated that in his opinion Mr. B. has a medical condition that has caused his cognitive impairments.
Dr. Wong testified that Mr. B. has rather severe cognitive deficits due to his brain injury. While Mr. B. can make very simple judgments, he needs assistance in caring for himself, especially concerning planning. It was Dr. Wong’s opinion that Mr. B. was not able to independently parent his son. Dr. Wong did not expect that Mr. B. would significantly improve over time, although he noted that some modest and measurable improvements have occurred.
Conclusions of Law
In order to terminate the respondent’s parental rights the petitioner must prove by clear and convincing evidence that Mr. B.:
(1) suffers from a mental illness or condition “which is manifested by a disorder or disturbance in behavior, feeling, thinking or judgment to such an extent that if such child were placed in or returned to the custody of the parent, the child *630 would be in danger of becoming a neglected child as defined in the family court act” (Social Services Law § 384-b [6] [a]);
(2) the parent is unable due to his or her mental illness to presently and for the foreseeable future adequately care for the child (Social Services Law § 384-b [4] [c]); and
(3) the child has been in the care of the agency for one year immediately prior to the filing of the petition (Social Services Law § 384-b [4] [c]).
The main issue in this case is whether Mr. B.’s condition constitutes a mental illness or condition within the definition of Social Services Law § 384-b (6) (a). A review of the reported decisions in this area does not reveal any cases regarding parents suffering from traumatic brain injuries. Most cases describe long-term or chronic parental mental illness (see, e.g. Matter of Aridyse Ashley J., 242 AD2d 438 [1st Dept 1997]; Matter of Juliana V., 249 AD2d 314 [2d Dept 1998]), especially schizophrenia (see, e.g. Matter of Joseph R., 191 AD2d 1034 [4th Dept 1993]; Matter of Juliana V., 249 AD2d 314 [2d Dept 1998]; Matter of Jessica N., 265 AD2d 800 [4th Dept 1999]) and personality disorders (see e.g. Matter of Angel Guardian Home v Nereida C., 199 AD2d 500 [2d Dept 1993]; Matter of Laura D., 270 AD2d 260 [2d Dept 2000]). Prior hospitalizations for mental illness and failures to recognize the need for treatment and cooperate with recommended treatment plans are common elements in these decisions (see e.g. Matter of Albert C. v Catholic Childcare Socy., 215 AD2d 232 [1st Dept 1995]; Matter of Jessica N., supra).
Respondent argues that Mr. B.’s condition is medical in nature and not a mental illness as defined by Social Services Law § 384-b (6) (a). In support of that position he has presented testimony from his primary physician, who has special experience in treating patients with traumatic brain injuries and a neuropsychologist, who is the director of neuropsychology at St. Mary’s Brain Injury Unit. Both of these experts agree that Mr. B.’s brain injury has resulted in cognitive deficits that are significant and permanent. Improvements are likely to be modest and may, for example, permit Mr. B. to work in a sheltered or supervised workplace or remember forgotten events or family members. In this regard, the opinions of respondent’s experts do not differ substantially from that of the court-appointed forensic psychiatrist that Mr. B.’s disability is expected to be lifelong and that his deficits in cognition would prevent him from adequately supervising or caring for his four-year-old son.
*631 None of the experts suggest that treatment or specialized care is likely to promote improvements in Mr. B.’s condition such that he would be able to parent Chance or care for himself without supervision (cf. Matter of Hime Y., 52 NY2d 242 [1981]).
Where the experts appear to disagree is how to characterize Mr. B.’s condition. The psychiatrist provides a primary diagnosis of dementia, a mental illness or condition. The internist and neuropsychologist would not use that term, but prefer the medical diagnosis of anoxic or hypoxic encephalopathy, which they indicate is not a mental illness.
The definition of mental illness contained in Social Services Law § 384-b (6) (a), however, is broader than the medical or commonly used definition and also includes “mental conditions” that impact mental functioning. This is especially true when the definition is read in conjunction with Social Services Law § 384-b (4) (c) which requires that the mental illness or condition negatively impact on the parent’s ability to adequately care for his child now and for the foreseeable future. Thus, it matters little whether the parent’s condition fits into a recognized clinical mental health diagnosis (see, Matter of Dylan K., 269 AD2d 826 [4th Dept 2000]), as long as the condition is “manifested by a disorder or disturbance in behavior, feeling, thinking or judgment to such an extent that if the child were placed in or returned to the custody of the parent, the child would be in danger of becoming a neglected child.” (Social Services Law § 384-b [6] [a].) Nor is the cause of the condition determinative of whether the statute is satisfied (see, Matter of Aridyse Ashley J., 242 AD2d 438, 439 [1st Dept 1997], supra [where the Court held that the opinion of the respondent’s expert that the mother’s problems were “drug-induced rather than psychiatric” did not preclude terminating her parental rights]). Rather, it is the manifestations of the mental condition that are the key.
While the experts have varying views on how to diagnose Mr. B.’s affliction, they agree about its impact on his ability to be an adequate parent. Since the respondent’s brain injury has resulted in a substantial and life-long deficit in his thinking and judgment that regrettably is not subject to remediation and which renders him presently and for the foreseeable future unable to provide the needed care for his son, the petitioner has proven that Mr. B. suffers from a mental illness that warrants a termination of parental rights.
Finally, the court notes that the respondent claims that he has been discriminated against in violation of the Americans *632 With Disabilities Act (ADA) (42 USC § 12132), because the County has failed to make reasonable accommodations for his disability by not providing adequate services that would enable him to parent his son. Additionally, the respondent suggests that he should be afforded a dispositional hearing to explore whether alternatives other than termination of parental rights would be in the child’s best interest, since such hearings are available to nohdisabled parents (see, Family Ct Act §§ 623, 625).
While the respondent does not suggest what type of accommodations and services would permit him to safely and properly care for his son, the proof indicates that Mr. B.’s condition would not lend itself to the usual parent counseling or training that is often provided to parents who aim to reunite with their children in foster care. It seems unlikely that Mr. B. could learn in the usual sense how to care for Chance, primarily because of his impaired memory and judgment. As a result, the only accommodation possible would be to provide a full-time caregiver for Chance, who would be needed in addition to the extensive supervision services provided to his father.[2] There is no indication in the record that such an arrangement would be consistent with Chance’s best interest or that it could be reasonably provided.
The ADA provides: “[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.” (42 USC § 12132.) While there is little doubt that Mr. B.’s brain injury constitutes a disability for the purpose of the statute (see, 42 USC § 12102 [2]), termination of parental rights proceedings do not appear to be “services, programs, or activities” such that the ADA would apply here (see, In re B.S., 166 Vt 345, 351-352, 693 A2d 716, 720 [1997]). Additionally, New York State law does not require the provision of services to parents as a prerequisite to termination of parental rights based upon mental illness. (Social Services Law § 384-b [4] [c]; [6]; see also, Stone v Daviess County Div. of Children & Family Servs., 656 NE2d 824 [Ind Ct App 1995] [where the Indiana Court of Appeals held that the ADA did not apply to its termination of parental rights statute noting that Indiana law does not require proof that the parent has been offered services prior to termination of parental rights].)
*633 The issue of whether an alleged violation of a parent’s rights under the ADA constitutes a defense to a proceeding to terminate parental rights remains an issue of first impression in New York. Several States have found the ADA inapplicable to termination of parental rights proceedings (see e.g., In re Antony B., 54 Conn App 463, 735 A2d 893 [1999]; In re B.S., 166 Vt 345, 693 A2d 716 [1997] supra; State in Interest of B.K.F., 704 So 2d 314 [La App, 5th Cir 1997], appeal denied 709 So 2d 779 [La 1998]; Stone v Daviess County Div. of Children & Family Servs., supra, at 830). Several other States have in individual cases determined that the parents were provided appropriate services and, therefore, no violation of the ADA occurred (see e.g., Interest of C.M., 526 NW2d 562, 566 [Iowa App 1994]; In re Angel B., 659 P2d 277, 279 [Mont 1995]; In re Welfare of A. J. R. v Department of Social & Health Servs., 78 Wash App 222, 230, 896 P2d 1298, 1302, cert denied 127 Wash 2d 1025, 904 P2d 1157 [1995]). Research does not reveal any reported case where a termination of parental rights case was dismissed based upon a claim of a violation of the ADA.
This does not mean, however, that a failure of the government to offer a disabled parent access to remedial services available to nondisabled parents may not in a proper case provide a separate and independent claim under the ADA (see e.g., Interest of Torrance P., 187 Wis 2d 10, 16, 522 NW2d 243, 246 [1994]). It may also provide a sound argument at a permanency hearing (Family Ct Act § 1055 [b]; Social Services Law § 392 [1] [e]; [5-a]) for the development of an individualized service plan including reasonable accommodations for a disabled parent whose goal is to have his or her child come home.
Nor does the lack of a dispositional hearing to inquire into the child’s best interest for mentally disabled parents violate the ADA. Although a dispositional hearing is not mandated in cases involving mentally ill or retarded parents (Matter of Sean S. S., 143 AD2d 836 [2d Dept 1988]), there is no prohibition under the Social Services Law to holding a dispositional hearing in a mental illness case as a matter of sound judicial discretion. In most cases, however, the fact that the parent is presently and for the foreseeable future unable to care for his or her child will mean that termination of parental rights is consistent with the child’s best interest. Such is the case under the facts presented here. Consequently, the court finds no need to hold a dispositional hearing.
For all the reasons stated above, the court finds that the petition has been proved by clear and convincing evidence. Since *634 the petition has been sustained, the guardianship and custody of Chance is committed to the Director of the Monroe County Department of Social Services for the purpose of adoption.

. Dr. Harris stated that the terras anoxic encephalopathy and hypoxic encephalopathy are used interchangeably.

. Mr. B. lives in a specialized supervised residence. It seems unlikely that his program could accommodate a child even if a full-time caregiver could be provided for Chance.