Matter of Lacee L. (Stephanie L.) (2018 NY Slip Op 06966)

Matter of Lacee L. (Stephanie L.)

2018 NY Slip Op 06966 [32 NY3d 219]

October 18, 2018

Wilson, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, January 16, 2019

[*1]

In the Matter of Lacee L., an Infant. Stephanie L., Appellant; Administration for Children's Services, Respondent, et al., Respondent.

Argued September 5, 2018; decided October 18, 2018

Matter of Lacee L. (Stephanie L.), 153 AD3d 1151, affirmed.

{**32 NY3d at 225} OPINION OF THE COURT

Wilson, J.

Stephanie L. seeks to raise this question: can Family Court find that the New York City Administration for Children's Services (ACS) made "reasonable efforts" toward family reunifications, as required by Family Court Act § 1089, if ACS failed to provide "reasonable accommodations" required by the Americans with Disabilities Act (ADA), which requires that governmental agencies make "reasonable accommodations" to ensure disabled persons have access to their services (42 USC § 12131 [2])? However, Stephanie L. has not identified any services allegedly required by the ADA that are not also required under New York law. Applying section 1089, Family Court ordered ACS to provide the services Stephanie L. claimed as "reasonable accommodations" under the ADA. Stephanie appears generally to have received those services; as Family Court noted, ACS did not provide its services eagerly or promptly, and provided some only because of stern admonitions from Family Court and vigorous follow up from Stephanie's counsel. The Appellate Division determined that Family Court "look[ed] to the ADA's standards . . . evaluat[ed] the agency's efforts in that light, [and] found that the agency . . . tailor[ed] its efforts to the mother's needs" (Matter of Lacee L. [Stephanie L.], 153 AD3d 1151, 1152 [1st Dept 2017]). Family Court's determination—affirmed by the Appellate Division—that ACS had made "reasonable efforts" is supported by the record; we therefore affirm.
I.
[*2]Article 10 of the Family Court Act was "designed to establish procedures to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being" and to "provide a due process of law for determining when the state, through its family court, may intervene against the wishes of a parent on behalf of a child so that [the child's] needs are properly met" (Family Ct Act {**32 NY3d at 226}§ 1011). An article 10 proceeding "is originated by the filing of a petition in which facts sufficient to establish that a child is an abused or neglected child . . . are alleged" (Family Ct Act § 1031 [a]). "Article 10 erects a careful bulwark against unwarranted state intervention into private family life" and "[n]eglect findings cannot be casually issued, but require proof of actual or imminent harm to the child as a result of a parent's failure to exercise a minimum degree of care" (Matter of Jamie J. [Michelle E.C.], 30 NY3d 275, 284 [2017] [internal quotation marks omitted]; see Family Ct Act § 1012 [f]).
Article 10-A of the Family Court Act "establish[es] uniform procedures for permanency hearings for all children who are placed in foster care . . . [in order] to provide children placed out of their homes timely and effective judicial review that promotes permanency, safety and well-being in their lives" (Family Ct Act § 1086). The Act provides for an initial permanency hearing within eight months of a child's removal from home, and subsequent permanency hearings every six months thereafter (Family Ct Act § 1089 [a] [2]-[3]). Prior to the permanency hearing, ACS must prepare a permanency hearing report, which must include, among other things, the child's current "permanency goal" (Family Ct Act § 1089 [b], [c] [1]). The permanency plan must include a "description of the reasonable efforts to achieve the child's permanency plan that have been taken by [ACS] since the last hearing" and when the permanency goal is reunification, the description "shall include . . . the reasonable efforts that have been made by [ACS] to eliminate the need for placement of the child and to enable the child to safely return home, including a description of any services that have been provided" (Family Ct Act § 1089 [c] [4] [i]).
At the conclusion of a permanency hearing, Family Court "shall, upon the proof adduced, and in accordance with the best interests and safety of the child, including whether the child would be at risk of abuse or neglect if returned to the parent or other person legally responsible, determine and issue its findings, and enter an order of disposition in writing" (Family Ct Act § 1089 [d]). If the child is not returned to the parent, the order must state, among other things, "whether reasonable efforts have been made to effectuate the child's permanency plan" (Family Ct Act § 1089 [d] [2] [iii]).
Congress enacted the ADA, in part, "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" (42 USC {**32 NY3d at 227}§ 12101 [b] [1]). Under title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity" (42 USC § 12132). ACS falls within the definition of a "public entity" (see 42 USC § 12131 [1] [B]). An agency, like ACS, that is subject to title II of the ADA must make "reasonable accommodations" to allow "meaningful access" to government services (Wright v Giuliani, 230 F3d 543, 548 [2d Cir 2000 per curiam]).
A disabled individual who has been denied access to government services can seek redress by commencing a private cause of action under title II of the ADA.[FN1] "In order to establish a violation under the ADA, the plaintiffs must demonstrate that (1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that [the] plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of [the] plaintiffs' disabilities" (Henrietta D. v Bloomberg, 331 F3d 261, 272 [2d Cir 2003]).
II.
[*3]It is undisputed that Stephanie L. is intellectually disabled. She has cognitive limitations that make it difficult for her to understand instructions and follow through on tasks. When she does understand her obligations, she has difficulty thinking through options to overcome obstacles that emerge.
Before Lacee's birth, Family Court entered a finding of neglect against Stephanie as to a different child of hers in May of 2014. When Lacee was born, ACS removed her from Stephanie's care and filed a petition under article 10 of the Family Court Act alleging that Lacee was a neglected child because, among other things, Stephanie had not completed the mental health and drug treatment required in the case involving her prior child. Lacee was placed in kinship care, with her paternal grandmother.{**32 NY3d at 228}
At a hearing five days after Lacee's birth, Stephanie's counsel notified Family Court of her client's cognitive limitations and asked that ACS make reasonable accommodations towards the agreed-upon permanency plan goal of reunification of mother and child. Initially, Stephanie requested two accommodations: a referral for psychological and cognitive testing so that ACS could better understand Stephanie's condition, and a referral for homemaking services. The parties disagree whether the requests were clearly made, but Stephanie did not then receive those accommodations. ACS did enroll Stephanie in programs at the Family Resource Center, though unsure whether that organization was equipped to address Stephanie's disability. A few months later, ACS notified Stephanie that it was trying to find an appropriate program but had not yet found one that would accept Stephanie's insurance.
On October 27th, 2014, ACS issued a permanency hearing report reiterating that "Return to Parent" remained Lacee's permanency planning goal and outlining the efforts made by ACS towards achieving that goal. The report stated that Stephanie had not complied with certain aspects of the service plan that was devised in furtherance of the reunification goal, including the completion of drug treatment and parenting programs. Stephanie contended that she had not tested positive for drugs since Lacee's birth and that she stopped attending the parenting class because she believed she was told the course—rather than a specific class meeting date—had been canceled. The report did not mention Stephanie's intellectual disability, cognitive limitations, or request for accommodations.
On November 21st, shortly before her December 1st hearing date, Stephanie moved Family Court for a determination that ACS had not made reasonable efforts to reunite Stephanie with Lacee because ACS had not complied with the ADA. She listed five accommodations that had not been provided:
1. informing Stephanie's attorneys about out-of-court conferences (ACS had held conferences about Stephanie without either her attorney or social worker on June 9th and September 16th);
2. referring Stephanie to service providers capable of handling parents with intellectual disabilities;
3. accepting Lacee's paternal grandmother's offer to serve as a liaison between ACS and Stephanie, as she and Stephanie saw or spoke to each other nearly every day;{**32 NY3d at 229}
4. assisting Stephanie in connecting with a Medicaid coordinator to help Stephanie enroll in certain services that required certification; and
5. connecting Stephanie to services offered by the Office for People with Developmental Disabilities (OPWDD).
Family Court responded by requiring ACS to hold regularly scheduled meetings with Stephanie's counsel and social worker; send all referrals and notices of conference in writing to Stephanie's attorney, social worker, and Lacee's paternal grandmother (with whom Lacee had been placed); refer Stephanie to services offered by agencies capable of working with parents with disabilities; furnish a social worker or staff person to accompany Stephanie to OPWDD to obtain appropriate services; and send monthly reports to the Court and counsel detailing the progress made.
ACS provided some of the court-ordered services and contends that it was not able to provide others because Stephanie did not perform certain tasks needed to obtain those services and did not notify ACS that her disability interfered with her ability to perform those tasks. A few months later, at another hearing, Stephanie again asked for those services, reiterating that the ADA required ACS to provide them. ACS contended that Family Court was jurisdictionally unable to rule on ACS's compliance with the ADA, and that Family Court must consider Stephanie's requests under New York's "reasonable efforts" standard. ACS outlined the efforts made to provide the court-ordered services, including: frequently calling Stephanie but not getting through because her cell phone was often turned off; making several personal visits to Stephanie's home and most often finding she was not there; attempting to facilitate supervised agency visitation with Lacee, but struggling because ACS could not reach Stephanie by phone or in person; and making efforts to refer and connect Stephanie to various parenting and family support programs. At [*4]the close of the June 15, 2015 hearing, Family Court severely chastised ACS for failing to comply with the court's previously ordered services for Stephanie and reemphasized those orders.
On April 5, 2016, Family Court issued an order memorializing findings it made on the record on December 15, 2015, covering the period from June 2014 through March 2015. By the date of the April 2016 decision, Stephanie had substantially{**32 NY3d at 230} received the requested accommodations.[FN2] Family Court denied Stephanie L.'s "motion for relief under the ADA." In so doing, Family Court cited the First Department's decision in Matter of La'Asia Lanae S. (23 AD3d 271, 271 [1st Dept 2005]), which stated that the ADA "has no bearing" on an article 10 proceeding. However, Family Court also held that ACS's efforts "must be tailored to the particular circumstances and individuals in a given case," and that "a court may properly look towards the ADA's standards for guidance as to whether 'diligent efforts' were made under [Social Services Law] § 384-b(7)." Thus, Family Court recognized that it was "required to consider [the family's] special needs when determining if the efforts were reasonable in this case."
The Appellate Division affirmed, substantively reiterating its verbiage from La'Asia Lanae, saying that "the ADA is not applicable to this proceeding." Nevertheless, the Appellate Division advised that "the law makes clear . . . that 'the agencies' efforts towards a permanency plan must be tailored to the particular circumstances and individuals in a given case' " (Matter of Lacee L. [Stephanie L.], 153 AD3d 1151, 1152 [2017]). The Appellate Division summarized its affirmance by noting that Family Court properly precluded litigation of ADA claims during the permanency hearing but was "considerate of [the ADA's] purpose to guide the reasonable efforts analysis" (id.).
III.
To be sure, ACS must comply with the ADA. Indeed, ACS affirms as much in its brief, stating that it "must comply with the ADA as part of its reasonable efforts to reunify children with parents who are disabled." ACS further explains that the ADA "play[s] an important role in permanency hearings" and that New York's "reasonable efforts" requirement "already includes reasonable attempts to accommodate a parent's disability." ACS argues that section 1089's "reasonable efforts" standard and the ADA's "reasonable accommodation" requirement "stand in considerable harmony, insofar as both require that services be tailored to the specific needs of people with{**32 NY3d at 231} disabilities."[FN3] Stephanie L. and the Attorney for the Child contend that the standards are identical.
Although there may be a case in which the facts suggest that the two standards differ in some material way, this is not that case: Stephanie L.'s counsel expressly stated that the accommodations allegedly required by the ADA would also be required under New York's "reasonable efforts" standard, and Stephanie L. has apparently received those accommodations, though not in as timely a fashion as Family Court deemed desirable. Accordingly, this case does not provide any opportunity or basis for us to decide whether the ADA and New York standards overall are coterminous or distinct in any way.
[1] What we can say, however, is that the Appellate Division's statement that the ADA "is not applicable to this proceeding" (Matter of Lacee L. [Stephanie L.], 153 AD3d 1151, 1152 [2017]) and its prior statement that the ADA "has no bearing on the proceeding" (Matter of La'Asia Lanae S., 23 AD3d 271, 271 [1st Dept 2005]), are not entirely accurate. In La'Asia Lanae, the Appellate Division expressly found that the agency had "reasonably accommodated" the parent's disability, and that "a preponderance of the evidence show[ed] that [the parent] cannot presently ameliorate the conditions that led to the children's placement" (23 AD3d at 271). La'Asia Lanae relied, in turn, on Matter of Chance Jahmel B., in which Family Court concluded that the proposed accommodation, "a full-time caregiver for Chance," was not "consistent with Chance's best interest or . . . could be reasonably provided" (187 Misc 2d 626, 632 [Fam Ct, Monroe County 2001]). In those cases, as here, Family Court expressly considered the reasonableness of the requested accommodations and did not deem any federal law standard irrelevant to the inquiry. Permanency proceedings have distinct purposes [*5]and procedures and thus are not the appropriate forum to adjudicate affirmative claims brought under the ADA. However, Family Court should not blind itself to the ADA's requirements placed on ACS and like agencies. The courts may look at the accommodations that have been ordered in ADA cases to provide guidance as to what courts have determined in other contexts to be feasible or appropriate with respect to a given disability.{**32 NY3d at 232}
IV.
Although ACS undoubtedly must comply with the ADA, ACS's failure to offer or provide certain services at the time a six-month permanency reporting period ends does not necessarily mean that ACS has failed to make "reasonable efforts." Family Court is not required to determine compliance with the ADA in the course of a permanency proceeding. The ADA's "reasonable accommodations" test is often a time- and fact-intensive process with multiple layers of inquiry (Duvall v County of Kitsap, 260 F3d 1124, 1136 [9th Cir 2001] [court adjudicating ADA claim charged with the "duty to gather sufficient information from the disabled individual and qualified experts" (internal quotation marks omitted)]). That adjudication is best left to separate administrative or judicial proceedings, if required (see 28 CFR 35.107 [b]; 35.170; 42 USC § 12133). Family Court is charged with assessing whether reasonable efforts were made to achieve the permanency goal "in accordance with the best interests and safety of the child" (Family Ct Act § 1089 [d]).
[2] Here, the record reflects that Family Court was working assiduously to evaluate and accommodate Stephanie L.'s need for services tailored to her own disabilities as they related to parenting Lacee L. Stephanie L. disclaims any attempt to have brought an ADA claim in Family Court and did not prove in any other forum an ADA violation, but instead argued that certain accommodations would have been required under the ADA. Moreover, the ADA contains no fixed time period for compliance, and the reasonableness of efforts to provide an accommodation will vary with the facts of each case (Staron v McDonald's Corp., 51 F3d 353, 356 [2d Cir 1995] ["Although neither the ADA nor the courts have defined the precise contours of the test for reasonableness, it is clear that the determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it"]). New York's six-month measuring period is not a final determination as to an agency's efforts to provide services, but a periodic checkpoint to help ensure that at-risk children are not falling through bureaucratic fissures (see Family Ct Act § 1089; Matter of Demetria FF. [Tracy GG.], 140 AD3d 1388, 1390 [3d Dept 2016]). Family Court has substantial discretion to make factual{**32 NY3d at 233} determinations that ACS's inchoate attempts to provide services have been "reasonable." In other words, even as to accommodations that might be required under the ADA, the failure of ACS to offer or deliver such accommodations by the end of a given measuring period does not necessarily mean that ACS has violated the ADA or failed to make reasonable efforts under New York law.
V.
In this case, the record contains support for the Appellate Division's affirmance of Family Court's determination that ACS—albeit sometimes as a result of court orders—made reasonable efforts to provide Stephanie L. with services to facilitate the permanency goal of "Return to Parent." Stephanie L. requested five accommodations under the ADA; at oral argument, her counsel affirmed that Stephanie would have requested those exact same accommodations under New York law if the ADA did not exist.[FN4] The record reflects that each of those [*6]accommodations was eventually provided to her. Some were not provided immediately upon request, sometimes because of miscommunications, sometimes because of lack of follow-through by Stephanie L. or ACS personnel, and sometimes simply because processing eligibility through outside governmental agencies (such as OPWDD) does not happen overnight. Others were provided with substantial effort by the court and Stephanie's attorneys. But each requested item has been provided, and, according to the parties' briefs, the permanency goal presently remains "Return to Parent."
The record contains numerous disputed facts bearing on the question of who was responsible for what delay, and what was known or reasonably could have been known by ACS or Stephanie L. It is not our function to resolve those factual disputes. What is clear from the record is that Family Court took seriously Stephanie's need for services, was frustrated with ACS's slow pace in providing some of those services, and{**32 NY3d at 234} (aided by Stephanie's attorneys) did not let Stephanie's needs go unmet. Family Court did criticize the efforts of ACS, noting that
"the agency surely should have done further and more regular follow-up with both the service providers and the parents . . . Indeed, it took considerable prodding from the other attorneys in this case to make clear to the agency that a more carefully crafted approach was needed in this case. . . . [I]t is the job of the agency and ACS to make these targeted efforts, not the parents' and child's attorneys" (Matter of Lacee L. [Stephanie L.—Dekodia L.], Fam Ct, Bronx County, Apr. 5, 2016, Hettleman, J., docket No. NN 14741/14).
Nonetheless, the record supports Family Court's conclusion that ACS's efforts in this case met a minimum threshold of reasonableness during the measuring period in question.
Accordingly, the order of the Appellate Division should be affirmed, without costs, and certified question answered in the affirmative.

Rivera, J. (dissenting). New York City's Administration for Children's Services (ACS) did not provide appellant, a parent with a cognitive disability, with accessible services as required by the Americans with Disabilities Act (ADA), even though ACS concedes that she requires these services and that ACS is subject to ADA mandates. Although Family Court found it necessary to order ACS to provide accessible disability services, it inexplicably and erroneously concluded [*7]that, despite the failure to comply with its order, ACS made "reasonable efforts" to achieve appellant's reunification with her daughter Lacee L., in accordance with New York law.
We should reverse. Nevertheless, the majority holds that because appellant's counsel stepped in to assist appellant, ACS affirmatively complied with the law. That reasoning ignores the fact that the federal and state statutory obligations fall squarely on ACS. Shifting the burden to a disabled parent undermines the purpose of the federal law, which is to place persons with disabilities in an equal position with persons who do not have physical or intellectual challenges to access government services that affect fundamental rights. The purpose of the ADA, and New York's public policy favoring family reunification and the eradication of discrimination in all its{**32 NY3d at 235} forms, is to eliminate obstacles to access, not to reward government inaction and dilatory conduct. I dissent.
I.
Congress enacted the Americans with Disabilities Act of 1990 to address historical and persistent discrimination against individuals with disabilities, which had the effect of placing them in an inferior status, unable to fully participate in society.[FN1] As explained in the ADA's Congressional findings, society has historically excluded and segregated individuals with disabilities and relegated such persons to lesser jobs, benefits, and services, denying them equal opportunities in critical areas of life (42 USC § 12101 [a] [1]-[8]).[FN2][*8][*9]Among its stated purposes, the ADA seeks "to provide a clear and comprehensive {**32 NY3d at 236}national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities" (42 USC § 12101 [b] [1]; [2]). As the law of the land, these standards supersede any conflicting or ineffectual state laws or policies (US Const, art VI, cl 2; 42 USC § 12202 [abrogating the sovereign immunity of states as to ADA claims]; Mary Jo C. v New York State & Local Retirement Sys., 707 F3d 144, 163 [2d Cir 2013]).
In response to "evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services" (Tennessee v Lane, 541 US 509, 528 [2004]), title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity" (42 USC § 12132). A "qualified individual with a disability" includes persons with physical disabilities as well as those, like appellant, with a "mental impairment that substantially limits one or more major life activities" (42 USC § 12102 [1] [A]; [2] [A]).
{**32 NY3d at 237}Title II is intended to provide individuals with disabilities an equal opportunity to access the state services that enable all individuals to exercise their fundamental rights (see Lane, 541 US at 524). As the United States Supreme Court has explained, "[i]t is not difficult to perceive the harm that Title II is designed to address. Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights" (id.).
To achieve its goals, the ADA imposes an affirmative obligation on a public entity to provide "reasonable modifications in policies, practices, or procedures" to accommodate individuals with disabilities (28 CFR 35.130 [b] [7] [i]; 42 USC §§ 12131, 12132). "[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it" (Mary Jo C., 707 F3d at 153, quoting Staron v McDonald's Corp., 51 F3d 353, 356 [2d Cir 1995]). To meet this standard, the agency must engage in an interactive process by evaluating an individual's specific needs when it becomes aware of the individual's request for accommodations (see Wright v New York State Dept. of Corr., 831 F3d 64, 80 [2d Cir 2016]).
The federal mandates are integral to the state's provision of public services and apply "to anything a public entity does," which includes the provision of child welfare services (28 CFR part 35, Appendix B, subpart A). The Department of Justice and Department of Health and Human Services have stated that discrimination against disabled parents are "long-standing and widespread," "[d]iscriminatory separation of parents from their children can result in long-term negative consequences to both parents and their children," and "[a]ny case of discrimination against parents and caregivers due to their disability is not acceptable" (US Department of Health and Human Services & US Department of Justice, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts Under Title II of the Americans With Disabilities Act and Section 504 of the Rehabilitation Act [Aug. 2015], available at https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html, cached at 
http://www.nycourts.gov/reporter/webdocs/ProtectingRightsParentswithDisabilities.pdf). However, the{**32 NY3d at 238} "goals of child welfare and disability non-discrimination are mutually attainable and complementary [as] ensuring that parents and prospective parents with disabilities have equal access to parenting opportunities increases the opportunities for children to be placed in safe and caring homes" (id.).
Disabled parents, like all parents, have a fundamental right to raise their children that is protected by the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment (Stanley v Illinois, 405 US 645, 651 [1972], citing Meyer v Nebraska, 262 US 390, 399 [1923]). The import of this right needs little elaboration: a "parent's 'desire for and right to "the companionship, care, custody, and management of [their] children" ' is an interest [*10]far more precious than any property right" (Santosky v Kramer, 455 US 745, 758-759 [1982], quoting Lassiter v Department of Social Servs. of Durham Cty., 452 US 18, 27 [1981]). Accordingly, we have repeatedly held that the state may not deprive a "parent of the right to the care and custody of a child absent a demonstration of abandonment, surrender, persisting neglect, unfitness or other like behavior evincing utter indifference and irresponsibility to the child's well-being" (Matter of Marie B., 62 NY2d 352, 358 [1984] [listing cases]). These protections apply equally regardless of a parent's physical or cognitive ability for many parents with a disability, just as non-disabled parents, are capable of caring for children and providing a loving and nurturing home environment (42 USC § 12101 [a] [1] ["physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society"]).
Where a child is removed from the custody of the parent for alleged neglect, as in appellant's case, ACS is the city agency charged with developing a permanency goal[FN3] and permanency hearing report, and with carrying out the child's permanency plan in compliance with the Family Court Act (Family Ct Act §§ 1087 [e]; 1089 [c], [c] [4] [i]). Here, the permanency plan has always been to return Lacee L. to appellant's custody. Importantly, the Family Court Act requires ACS to demonstrate in its permanency hearing reports that it has made "reasonable {**32 NY3d at 239}efforts . . . to eliminate the need for placement of the child and to enable the child to safely return home" (Family Ct Act § 1089 [c] [4] [i]). ACS concedes that it is a "public entity" as defined by the ADA, and that the ADA's reasonable accommodations requirement applies to its provision of services.[FN4]
The Family Court Act's requirement that ACS undertake "reasonable efforts" toward family reunification reflects the legislature's finding that a child is ordinarily given the best opportunity to thrive and develop when they are raised by their parent (Matter of Michael B., 80 NY2d 299, 308-309 [1992]; Social Services Law § 384-b [1] [a] [i], [ii]). New York law further requires that ACS's reasonable efforts be "tailored to the particular circumstances and individuals in a given case" (Matter of Lacee L. [Stephanie L.], 153 AD3d 1151, 1152 [1st Dept 2017]; Matter of Cloey S. [Anthony T.], 99 AD3d 1080, 1081 [3d Dept 2012]; Matter of Shaquanna C., 184 AD2d 509, 510 [2d Dept 1992]; see Social Services Law § 384-b [7] [f] [providing that ACS must consult and cooperate with parents to develop a "plan for appropriate services" in order to meet the analogous "diligent efforts" requirement in termination of parental rights proceedings]).
II.
New York's "individually tailored services" and reasonable efforts standard is fully congruent with the federal "reasonable modifications" requirement. Both compel ACS to design services that address the individual's needs and further the state's permanency goal for the child. Here, at all times, that goal has been reunification of the appellant with her daughter.
The national standards set forth in title II of the ADA constitute the statutory floor below which ACS's efforts may not fall (42 USC § 12112 [b] [5] [A] [providing that the failure to provide accommodations amounts to discrimination on the basis of a disability]; Mary Jo C., 707 F3d at 162-163 [holding that Congress intended title II of the ADA to sweep broadly{**32 NY3d at 240} and thus "requires preemption of inconsistent state law when necessary to effectuate a required 'reasonable modification' "]). After all, the ADA requires public entities to provide reasonable accommodations to provide disabled individuals with "meaningful access" to services (Wright v Giuliani, 230 F3d 543, 548 [2d Cir 2000]). It follows that ACS's efforts towards reunification could only be reasonable if they included services that were accessible to the parent. We need not decide whether Family Court may determine, in a particular case, that ACS failed to meet its obligations under the Family Court Act even if technically in compliance with the ADA. Any heightened requirements imposed by state law would not affect a court's threshold determination.
To be clear, Family Court need not make an express finding that ACS failed to comply with the ADA to hold that ACS failed to provide meaningfully appropriate and properly tailored reunification services. All that Family Court must do is determine whether ACS made "reasonable efforts" toward family reunification by providing services that a disabled parent could access (Family Ct Act § 1089 [d] [2] [iii]). In other words, Family Court must decide whether ACS took the steps legally required to place a disabled parent in the same position to benefit from services as a parent without disabilities.
ACS is incorrect when it argues that a determination as to its provision of ADA reasonable accommodations is external or irrelevant to the reasonable efforts finding. We would reject this finding outright if any other kind of discrimination were involved. For example, if appellant had argued that ACS provided disparate services on the basis of her race, no one would doubt that Family Court would have to consider her assertions in assessing whether ACS had acted pursuant to its legal mandates. In other words, ACS could not have made reasonable efforts if its services were not equally available to parents of a different racial background. Moreover, it would be unrealistic to characterize this argument as a title VI claim of racial discrimination.[FN5] The analysis does not change here because appellant, relying on the ADA, bases her arguments on her disability and not on her race.{**32 NY3d at 241}
III.
The record in this case illustrates that ACS failed to comply with its statutory obligations. Five days after appellant gave birth to Lacee L., ACS filed a neglect petition and removed her from appellant's custody. On the day ACS filed the petition, appellant appeared in Family Court with counsel who requested "reasonable accommodations to be made" due to appellant's "cognitive delays." At the next appearance, appellant's attorney noted that appellant's cognitive disability was well-recorded in ACS records and that appellant would consent to psychological testing to ensure that ACS services were tailored to appellant's needs. Over the next four months, at two scheduled hearings, counsel reiterated appellant's request for a cognitive evaluation, argued for ACS to provide disability appropriate services, and asked ACS to connect appellant with the Office for People with Developmental Disabilities (OPWDD) and to refer her to parenting classes specifically for parents with disabilities. As the parties were approaching the six-month permanency hearing date in accordance with the Family Court Act (Family Ct Act § 1089 [a] [3]), counsel moved for a determination that ACS had failed to make reasonable efforts because it had not provided adequately tailored services, such as referrals for disability appropriate parenting services and assistance in submitting an application for OPWDD services.
At the permanency hearing, in December 2014, six months since the separation of appellant from her daughter, counsel again argued that ACS had failed to properly accommodate appellant's disability. In response, ACS never argued that appellant was not entitled to the services she requested or, significantly, that ACS could not provide these services. Nor did it argue that it had provided services requested by counsel or other services tailored to appellant's circumstances and needs. In fact, appellant had not yet undergone the cognitive testing counsel had requested and which ACS would need in order to properly assess how to provide appellant with meaningful access to reunification services. Based on the record before it, Family Court ordered ACS to provide several of the services requested by counsel, mandating ACS to (1) send all notices to appellant's attorney or mother-in-law; (2) connect appellant with OPWDD; (3) refer appellant to services for parents with disabilities; and (4) conduct monthly meetings with appellant, her attorney, and social worker.{**32 NY3d at 242}
By the next hearing in March 2015, ACS still had not arranged for a cognitive evaluation and had not complied with the court order to refer appellant to services for parents with disabilities and assist her in obtaining OPWDD services. ACS argued that it could not refer appellant to the requested programs or OPWDD because she had not provided certain necessary medical records. Appellant maintained that she needed ACS assistance to secure these records due to her disability. One year after Family Court's initial order for ACS to provide services, notices to counsel, and assistance with OPWDD, Family Court stated that "it sounds like services are not quite getting done." That was an understatement. Appellant obtained a mental health evaluation and the documents needed to submit an OPWDD application without the assistance of ACS.
Nearly two years after the initial petition was filed, Family Court held that ACS had made reasonable efforts towards family reunification for the period of June 2014 through March 2015. However, in reaching this determination, the court found that ACS
"surely should have done further and more regular follow-up with both the service providers and the parents. The very nature of [appellants'] apparent disabilities likely contributed to [their] failure to follow through with recommended services and requirements. Indeed, it took considerable prodding from the other attorneys in this case to make clear to the agency that a more carefully crafted approach was needed in this case. When that began, the parents' engagement in services and planning improved considerably."
Family Court also stated, "it is the job of the agency and ACS to make these targeted efforts, not the parents' and child's attorneys."
Nevertheless, Family Court concluded that the efforts made by ACS were enough to satisfy New York's reasonable efforts standard, and further rejected appellant's argument that ACS failed to provide reasonable accommodations in accordance with the ADA, because the ADA did not apply to permanency hearings. The Appellate Division affirmed, holding that while Family Court should "look to the ADA's standards for guidance" when considering whether ACS has met the reasonable efforts standard, the ADA was inapplicable to Family Court{**32 NY3d at 243} proceedings (Matter of Lacee L. [Stephanie L.], 153 AD3d 1151, 1152 [1st Dept 2017]).
The courts below erroneously held that ACS made reasonable efforts to enable Lacee L. to return to appellant's custody as provided by the permanency plan, because the record does not show ACS undertook "reasonable modifications in [its] policies, practices, or procedures" to accommodate appellant's needs and provide her with the necessary "tailored services" (28 CFR 35.130 [b] [7] [i]; 42 USC §§ 12131, 12132; Social Services Law § 384-b [7] [f]). As the record establishes, ACS failed to comply with Family Court's order mandating certain services and accommodations intended to address appellant's cognitive disability, which the court had determined, at the December 2014 hearing, were necessary to provide appellant the opportunity to regain custody of her child. [*11]ACS's failure to comply with the court's orders and its persistent refusal to provide appropriate services tailored to appellant's individual circumstances and needs in a timely fashion foreclosed any finding by Family Court that ACS had made "reasonable efforts" towards achieving Lacee L.'s permanency goal.[FN6]
Family Court may have held otherwise, but its findings do not support that conclusion. Family Court found ACS failed to provide services to appellant when ordered to do so and acted only after the insistence of counsel and others. Although Family Court noted that even after considerable delay in providing services an agency may satisfy the reasonable efforts standard if the delay is not attributable to the agency, that is not the case here. The delays affecting the timely delivery of services fall squarely on ACS, which made woefully inadequate attempts to comply with the court's order or otherwise take steps necessary to permit appellant to access appropriate services. ACS asserted that its staff made telephone calls to service providers—which Family Court credited despite drawing a negative inference against ACS for failing to provide supporting documents—but ACS itself never actually secured these services. ACS also claimed that the case planner attempted to, but did not see appellant on a regular basis, but this was again in violation of Family Court's order. ACS at times blamed its{**32 NY3d at 244} failure to provide services on appellant's unavailability, inaction or delay in submitting information requested from her and not counsel. Unfathomably Family Court accepted these representations while recognizing that "[t]he very nature of [appellant's] apparent disabilities likely contributed to [her] failure to follow through with recommended services and requirements." Indeed, counsel had explained to ACS on several occasions that ACS staff should communicate with counsel—which Family Court ordered—because of the challenges inherent to appellant's disability.
The fundamental problem is that during the period covered by Family Court's order, ACS did not take the steps necessary to adequately assess and provide the services appellant required. As Family Court stated, "it took considerable prodding from the other attorneys in this case to make clear to the agency that a more carefully crafted approach was needed in this case." Yet, as Family Court emphasized, it was the legal duty of ACS not others to make these efforts. It is axiomatic that if ACS does not understand a parent's disability it cannot provide services tailored to the circumstances and needs of the individual (Matter of Cloey S., 99 AD3d at 1081). In other words, the agency does not undertake statutorily required meaningful efforts when it does not know what it must do to address the challenges a disabled parent faces in attempting to access services. Indeed, it is difficult to read this record without drawing the conclusion that ACS did little to accommodate appellant's needs. The actions taken appear to be not much different from those that ACS would have followed if appellant was not disabled. Worse yet, to the extent her cognitive challenges affected her ability to comply with document and other requests from ACS (which ACS claimed slowed down its process), providing grounds for Family Court and the majority here to excuse ACS's delays and conclude that the agency met its affirmative obligations, appellant is in a worse position than a non-disabled parent who is able to act without the challenges posed by a disability.
The majority concludes that Family Court's finding of reasonable efforts has record support because appellant eventually got all her services through the combined efforts of her counsel, a social worker in counsel's office, and ACS. First, the only question before us is the propriety of the Family Court order challenged here, namely whether there is record support for Family Court's conclusion that ACS made reasonable efforts{**32 NY3d at 245} towards the goal of family reunification by providing meaningful access to services tailored to the appellant's circumstances and needs from June 2014 through March 2015. As Family Court recognized, during this period of time, and throughout the permanency proceedings, "it is the job of the agency and ACS to make these targeted efforts, not the parents' and child's attorneys." Thus, whether at some later date, because ACS failed to act, someone else provided the services is irrelevant as it was not the pertinent legal question and not the question Family Court considered.
[*12]
Nor does the fact that the permanency proceeding may exceed a six-month period minimize the importance of Family Court's assessment of ACS efforts at any particular juncture. Although the six-month period is a checkpoint (majority op at 
226), Family Court's review is intended to ensure that the agency is taking the legally required steps "to eliminate the need for placement of the child and to enable the child to safely return home" (Family Ct Act § 1089 [c] [4] [i]). It is not, as the majority suggests, a pause in the process during which the agency can meet its statutory requirements with claims of fainthearted attempts at compliance—as was the case here. ACS could not have made reasonable efforts if it failed to comply with Family Court's order and, as here, at most made some telephone calls and continued to tell appellant what to do, all the while aware that this would be inadequate because of appellant's cognitive challenges. There is no meaningful access when ACS tells someone to do something that they cannot do without services that ACS is legally mandated to provide.
Second, even though it was not the basis of Family Court's decision, the majority's view that as long as the services are provided by someone at some undefined time in the future, Family Court may decide that ACS affirmatively made reasonable efforts to meet its obligations, disregards legal mandates and the purpose behind disability anti-discrimination law, writ large and as expressed in title II of the ADA. The question is not whether a disabled person overcomes barriers when government fails to meet its lawful obligations, but whether the government has made its services available in a manner that allows a disabled person to access and benefit from them. By so doing, the disabled person is placed in the same position as any non-disabled person.
Under the majority's approach, ACS can fail to act, take its time to act, and even fail to comply with a court order because{**32 NY3d at 246} the disabled parent might find others to do ACS's job. That is not what the law permits and not what Congress intended when it enacted the ADA to ensure equality of opportunity for individuals with disabilities (42 USC § 12101 [a] [7]). To the contrary, it takes us back to the days when persons with disabilities received no services, but were expected to meet the same expectations applied to non-disabled individuals. Nor is the majority's approach consistent with our understanding of the state's adamant concern that children be returned to their parents where possible (see Matter of Jamie J. [Michelle E.C.], 30 NY3d 275, 284 [2017]; Matter of Marino S., 100 NY2d 361, 372 [2003]). Indeed, this point was not lost on the Family Court Judge himself, who noted the following in a March 2015 appearance:
"the human side of this is I have taken their child away, and the system is set up that if a child is taken away and the goal is return to parent, that we must make financial, emotional, and physical commitments to making that happen and that they must be meaningful in some way, shape, or form."
The facts in appellant's case illustrate why the majority is wrong that the record supports a finding that ACS made meaningful and reasonable efforts towards family reunification. Although counsel made the demands for services within two days of Lacee L.'s removal, it took close to two years and the independent efforts of appellant's counsel, a social worker in counsel's office, and Family Court's continued prodding, before appellant obtained the services to address her needs. As Family Court and the majority concede, ACS never provided all of the services. It dragged its feet until someone else finally acted to secure services for appellant.
The decision here is not limited to the facts of appellant's case because by holding that as long as a disabled parent gets the services they requested at some indeterminate time, regardless of the steps taken by the agency, the majority encourages unnecessary delay in the provision of legally mandated services. Thus, in a future case, ACS may, as here, provide some services, leaving it to counsel to find a way for a disabled parent to access the other services needed. That would meet the majority's test but it would undermine, as here, the goal of permanency reunification because it extends the amount of time the child is in foster care, potentially impacting a disabled{**32 NY3d at 247} parent's (or any parent's) ability to argue that reunification was in the best interests of the child (see Matter of Joyce T., 65 NY2d 39, 47-48 [1985] [holding that the "Legislature found that unnecessarily protracted stays in foster care deprive children of positive, nurturing family relationships"]; Matter of Walter D.H. [Zaire L.], 91 AD3d 950, 951 [2d Dept 2012]; Matter of Aisha T., 55 AD3d 435, 436 [1st Dept 2008] [terminating parental rights where five-year-old child had lived with foster family since infancy]; Matter of Michael D.H., 56 AD3d 1269, 1270 [4th Dept 2008] [terminating parental rights where there was evidence that child had maintained a bond with mother but had also been [*13]in foster care for two years and had bonded with foster family]; Matter of Jazminn O'Dell P., 39 AD3d 235, 235 [1st Dept 2007] [holding that while the parent's efforts to remediate the problems leading to the child's placement in foster care were "commendable," terminating parental rights was appropriate because the "child, now six years of age, has bonded with her foster parents with whom she has lived since infancy"]).
IV.
Much of the delay in Family Court and the ensuing appellate process might have been avoided if ACS had provided the services it concedes it is legally obligated to provide. Most troubling is the fact that ACS had a prior case with appellant and should have known about her intellectual disabilities and the services that might be necessary here based on its prior contact.
The attorney for Lacee L. and ACS both argue that reversal here would put the state in danger of losing federal reimbursement for services should we conclude that Family Court must make a finding of ACS compliance with the ADA because that finding would control in any future action against the agency. It bears stating that courts decide on the merits of a rights violation claim, not on speculative concerns about federal funding. In any case, the concern is misplaced. Appellant has not filed a claim for violation of the ADA and seeks no remedy under the ADA. She has not followed the federal and state protocols necessary to filing such an action. Thus, the majority's statement that an ADA claim must comply with federal requirements for filing such claim is accurate but beside the point (majority op at 
232). Returning to my hypothetical, if appellant had based her claim on race discrimination, she would{**32 NY3d at 248} not be making a title VI claim. The same holds true here where appellant requests that ACS meet its minimal legal obligations and that we look at the record and decide whether it has done so.
For the reasons I have discussed, I would reverse the Appellate Division and remand to Family Court for a finding that ACS did not make reasonable efforts to achieve the permanency goal.
Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman concur; Judge Rivera dissents in an opinion.
Order affirmed, without costs, and certified question answered in the affirmative.

Footnotes

Footnote 1:Title II of the ADA incorporates the remedial scheme of the Rehabilitation Act of 1973 (42 USC § 12133), which incorporates the remedial scheme of title VI of the Civil Rights Act of 1964 (29 USC § 794a). Because title VI of the Civil Rights Act includes a judicially implied private cause of action so too does title II of the ADA (see Garcia v S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F3d 98, 111 [2d Cir 2001]).

Footnote 2:At oral argument, Stephanie's counsel confirmed that she had received those accommodations, but contended that some had been obtained through the efforts of counsel, and "not as a result of ACS' efforts."

Footnote 3:The dissent's assertion that "ACS . . . argues that a determination as to its provision of ADA reasonable accommodations is external or irrelevant to the reasonable efforts finding" (dissenting op at 
240), is contradicted by the above statements, quoted from ACS's briefs in this case.

Footnote 4:For this reason, the dissent's argument that "[t]he courts below erroneously held that ACS made reasonable efforts" (dissenting op at 
243) has nothing to do with the ADA. Instead, the dissent's objection is that Family Court could not, as a matter of law, have found that ACS made "reasonable efforts" under the Family Court Act—even without regard to the ADA. It is clear from the record below that Family Court ordered ACS to provide the requested services; the dissent is, as Family Court was, frustrated with ACS's failure to obey those orders in a timely fashion. That concern does not implicate the ADA.

Footnote 1:Unsurprisingly, given the state's historic commitment to eliminating discrimination, New York acted before Congress to protect the rights of the disabled. New York passed the "Flynn Act" 16 years prior to the passage of the ADA, extending the scope of the Human Rights Law (HRL) to proscribe "discrimination on the basis of physical, mental or physical disability" (Mem of Attorney General, Bill Jacket, L, 1974, ch 988 at 19; State Div. of Human Rights v Xerox Corp., 65 NY2d 213, 220 [1985, Jasen, J., dissenting]). In 1984, again out in front of Congress, the state legislature broadened the protections of the HRL to encompass individuals with mental disabilities, aiming to guarantee such persons the "equal opportunity to participate fully in the economic, cultural and intellectual life of the state" (Executive Law § 290 [3]). New York City has also recognized the rights of individuals with disabilities in its own Human Rights Law (Administrative Code of City of NY § 8-101), and has affirmed its "pioneering commitment to human rights through repeated revisions to [the law]" (Chauca v Abraham, 30 NY3d 325, 335 [2017, Wilson, J., dissenting], quoting Rep of the Comm on Civil Rights on Local Law No. 35 [2016] at 5).

Footnote 2:"The Congress finds that—
"(1) physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination;
"(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
"(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;
"(4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;
"(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;
"(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;
"(7) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and
"(8) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity" (42 USC § 12101 [a] [1]-[8]).
Footnote 3:The possible permanency goals are return to the parents or parent; placement for adoption with the official filing of a petition for the termination of parental rights; referral for legal guardianship; placement with a fit and willing relative; or, if the child is older than 16 years, placed in "another planned permanent living arrangement that includes a significant connection to an adult" (Family Ct Act § 1089 [c] [1]).

Footnote 4:Contrary to the majority's assertion, while ACS concedes that it must comply with the ADA, it also maintains that the act's federal mandates are exogenous to Family Court's reasonable efforts assessment. As I argue, ACS cannot have it both ways, and neither can the majority. ACS cannot logically claim that it must meet the ADA's requirements, but that Family Court may find it has affirmatively met all its legal obligations when it fails to provide ADA compliant services. This is especially so where Family Court orders ACS to provide specific services due to a parent's disability and ACS fails to provide them.

Footnote 5:Title VI of the Civil Rights Act of 1964 prohibits programs that receive federal funding, including public entities, from excluding individuals from benefits on the basis of race (42 USC §§ 2000d, 2000d-4a).

Footnote 6:The majority mischaracterizes my conclusion as "frustrated with ACS's failure to obey [Family Court's] orders in a timely fashion" (majority op at 
233 n 4). My analysis is grounded in the law and the agency's failure to comply with its statutory obligations and is not affected by an emotional reaction to the facts of this case.