Matter of Joshua J. (Tameka J.) (2025 NY Slip Op 03010)

Matter of Joshua J. (Tameka J.)

2025 NY Slip Op 03010

Decided on May 20, 2025

Court of Appeals

Troutman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on May 20, 2025

No. 43
 

[*1]In the Matter of Joshua J.
Westchester County Department of
Social Services,
 Respondent;
Tameka J.,
 Appellant.
(And a Related Proceeding.)

George E. Reed, Jr., for appellant.
William E. Horwitz, for child Joshua J.
Joan Iacono, for child Christopher J.
Justin R. Adin, for respondent.
Children's Law Center, Lawyers For Children et al., Brooklyn Defender Services, et al., amici curiae.

TROUTMAN, J.:
Respondent mother contends that the Appellate Division abused its discretion by declining to invoke the mootness exception to review her appeals from two expired permanency hearing orders. The mother further asks this Court to recognize a new exception to the mootness doctrine, which would allow for appellate review of all mooted permanency hearing orders. Because we conclude that the Appellate Division providently exercised its discretion under these circumstances, and that a blanket mootness exception would be imprudent, we affirm the decision of the Appellate Division.
I.
In 2018, petitioner Westchester County Department of Social Services (DSS) commenced these Family Court Act article 10 neglect proceedings against the mother with respect to each of her four children. DSS alleged that the mother left her 5-year-old daughter in the care of her 14-year-old daughter, and, on two occasions, the 5-year-old was found alone in public without supervision. DSS further alleged that the mother allowed her 9- and 10-year-old sons to take public transportation to meet her at work without supervision. Despite being informed about each incident, the mother refused to make alternative care plans for the children or otherwise cooperate with DSS.
The mother consented to a finding of neglect, and a series of permanency hearings ensued [*2]regarding two of the children's placement in DSS custody [FN1]. In 2020, Family Court ordered that the two children be trial discharged to the mother's custody. Two months later, however, DSS reported that, in addition to not complying with Family Court's orders, the State Central Registry received a report alleging that mother was physically aggressive toward one child on video; verbally abused the children; and provided inadequate food, clothing, and shelter for the children. In light of these allegations, Family Court terminated the trial discharge, and the children were returned to DSS custody.
Additional permanency hearings ensued. Relevant to this appeal, in March 2022, Family Court issued a permanency hearing order, which continued the children's placement with DSS until the next permanency hearing; approved a permanency goal of reunification with the mother; and ordered the mother, among other things, to participate in an intensive parenting program, submit to full psychological and psychiatric evaluations, and comply with the recommendations thereof.
The mother appealed, and during the pendency of her appeal from the March 2022 order, a referee conducted another permanency hearing. While the mother's counsel cross-examined a caseworker regarding the mother's visits with one of the children, the referee asked counsel about the relevance of his questioning. The mother's counsel responded that the questions were relevant to the "ultimate question" of "whether the children should be returned to [the mother]." The referee thereafter stated, "I don't have that authority today to do that, nor would I . . . . [T]his is a pre-dispositional permanency hearing, so this [c]ourt would not be issuing that order today regardless of what I were to hear." Counsel noted his objection to the referee's ruling and indicated that he would not ask "most of the questions that [he] was planning" in light of that ruling.
Following the hearing, in an October 2022 order, Family Court again continued the children's placement with DSS until the next permanency hearing, approved a permanency goal of reunification with the mother, and ordered the mother to submit to and comply with the recommendations of an intensive parenting program and psychological and psychiatric evaluations. The mother appealed the October 2022 permanency hearing order. During the pendency of that appeal, Family Court held another permanency hearing and issued a new order.[FN2]
The Appellate Division dismissed the mother's appeals from both the March and October 2022 orders (see 220 AD3d 776, 777 [2d Dept 2023]; 220 AD3d 777, 778 [2d Dept 2023]). The Court concluded that, because the respective permanency hearing orders had "expired," the appeals were moot. The Court declined to invoke the exception to the mootness doctrine.
This Court thereafter granted the mother leave to appeal (see 41 NY3d 927 [2024]). We now affirm.
 II.
Generally, " 'an appeal will be considered moot unless the rights of the parties will be directly affected by the determination of the appeal and the interest of the parties is an immediate consequence of the judgment' " (Matter of Gonzalez v Annucci, 32 NY3d 461, 470 [2018], quoting [*3]Matter of Hearst Corp. v Clyne, 50 NY2d 707, 714 [1980]). Here, the Appellate Division properly determined that the mother's appeals are moot. At the time the Appellate Division entered its decisions, both permanency hearing orders were "superseded by subsequent permanency hearing orders, which continued the child's placement in foster care" (Matter of Breeyanna S., 45 AD3d 498, 498 [1st Dept 2007], lv denied 10 NY3d 706 [2008]).
Our dissenting colleagues propose that, because the "claimed errors" in the October 2022 permanency hearing "carried over into future proceedings," the order is not moot (Wilson, Ch. J., dissenting op at 13). This Court's well-established mootness doctrine simply provides no basis for that conclusion. The impact an error from an expired permanency hearing order might have in subsequent permanency hearings is not only entirely speculative, but the potential resolution of that error—long after its occurrence—is not an "immediate consequence" of the underlying order that would "directly affect[ ]" the rights of the parties (Matter of Hearst Corp., 50 NY2d at 714; see People ex rel. Geer v Common Council of Troy, 82 NY 575, 576 [1880] ["We do not decide mere abstract questions from the determination of which no practical result can follow"]). The rights of the parties are instead controlled by the superseding order.
The Chief Judge's conclusion that the March 2022 permanency hearing order is not moot "because the failure to return [the mother's] children itself prevented [her] from developing a record in subsequent proceedings" is even more puzzling (Wilson, Ch. J., dissenting op at 15). The sole "alleged error" (id. at 16 n 14) the mother argued on appeal from the March 2022 order was that Family Court should not have continued the children's placement with DSS because the mother asserted at the hearing, through counsel, that she was "ready, willing and able to have her children returned to her." Contrary to the Chief Judge's suggestion, this purported "error" did not in any way "impair [the mother's] ability to create a record useable in future proceedings to demonstrate that her children should be returned to her" (id.). Notably, it was the mother's decision not to introduce any evidence at the hearing; nothing prevented her from developing a record supporting why the children should be returned to her care, such as by demonstrating her compliance with Family Court's prior orders. Moreover, putting the mootness issue aside, we take issue with the Chief Judge's suggestion that a parent is somehow entitled to custody of their child, following a finding of neglect or abuse, for the purpose of "developing a record" (id.). This approach overlooks the sensitive nature of a child's custodial placement and is inconsistent with the Family Court Act's requirement that a child be placed "in accordance with [that child's] best interests and safety . . . , including whether the child would be at risk of abuse or neglect if returned to the parent" (Family Ct Act § 1089 [d]).
In sum, because the orders from which the mother appealed have been replaced by subsequent orders, the orders no longer affect the mother's rights and therefore are moot (see Matter of Hearst Corp., 50 NY2d at 714; Matter of Destiny F. [Takara E.], 217 AD3d 1400, 1401 [4th Dept 2023]; cf. Matter of Nevaeh L. [Katherine L.], 177 AD3d 1400, 1401 [4th Dept 2019]).
 III.
A court may nonetheless consider the merits of a moot controversy where "the controversy or issue involved is likely to recur, typically evades review, and raises a substantial and novel question" (Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801, 811 [2003], cert denied 540 US 1017 [2003]). Where, as here, the Appellate Division dismisses an appeal that it has properly determined to be moot, our review "is limited to whether the Appellate Division abused its discretion in declining to invoke the mootness exception to review the merits of certain of petitioner's challenges in this proceeding" (Matter of Prisoners' Legal Servs. of N.Y. v New York [*4]State Dept. of Corr. & Community Supervision, 42 NY3d 936, 937 [2024]; see Matter of Anonymous, 55 NY2d 1021, 1022 [1982]).
The mother appears to concede that the appeals are moot but maintains that the Appellate Division abused its discretion by not invoking the mootness exception to review the referee's ruling that she lacked the power to return the children to the mother pre-disposition [FN3]. Here, the Appellate Division did not abuse its discretion in determining that the issues raised below were "not sufficiently substantial or novel to warrant an exercise of [its] exceptional discretion to retain the appeal despite mootness" (Matter of David C., 69 NY2d 796, 798 [1987]). They were simply standard issues of the sort that arise in permanency hearing adjudications, such as whether Family Court's determination was "supported by a sound and substantial basis in the record" (Matter of Dakota F. [Angela H.], 180 AD3d 1149, 1151 [3d Dept 2020]; see Matter of Damani B. [Theresa M.], 174 AD3d 524, 526 [2d Dept 2019]). To the extent the mother contends that the referee erred by claiming to lack the power to return the children to the mother's care prior to a dispositional hearing, the record does not demonstrate that the issue is likely to recur (see generally Hearst Corp., 50 NY2d at 714)[FN4]. For example, the mother does not refer to any prior instance in which the issue was raised but went unresolved, the issue does not implicate the application of a new statute, and the mother does not raise a systemic problem in the Family Court—such as consistent misinterpretation of a provision of the Family Court Act or the precedents of this Court. As a result, we cannot say that the Appellate Division abused its discretion in declining to invoke the exception to the mootness doctrine under these circumstances.[FN5]
 IV.
Notwithstanding the Appellate Division's discretionary determination not to invoke the mootness exception, the mother invites us to adopt a blanket mootness exception, which would allow the Appellate Division to review all mooted permanency hearing orders, regardless of the issues presented on appeal. We decline the invitation to guarantee appellate review of these orders regardless of mootness (see generally Matter of David C., 69 NY2d at 798 [declining to recognize [*5]a blanket mootness exception in the context of Mental Hygiene Law retention proceedings])[FN6]. As this Court made clear in Matter of David C., "[t]he determination whether to consider particular issues despite their mootness must depend additionally on the recurring, novel and substantial nature of those issues as they are presented" (id.).
Even assuming the Court could properly create such a blanket exception, the mother's proposed rule is not workable or prudent inasmuch as it would unnecessarily flood appellate courts with appeals that, in many cases, present only moot issues whose resolution would have no real impact on the rights of the parties or the law of this State. Moreover, the purpose of the permanency hearing scheme established by Family Court Act article 10-a is to "provide children placed out of their homes timely and effective judicial review that promotes permanency, safety and well-being in their lives" (Family Ct Act § 1086). The six-month schedule governing hearings reflects an understanding that the circumstances of a child or parent may change rapidly, requiring a change in permanency goal. Appellate review of the merits of a permanency hearing order, decided upon circumstances that may have since changed, risks undermining the purpose of article 10-a by injecting unnecessary uncertainty into the life of the child.
Additionally, to the extent that the mootness issue surrounding permanency hearing orders can be addressed through an automatic expedited appeal process, this appeal is not a proper vehicle by which to implement that process. While we appreciate Chief Judge Wilson's observations that the legislature empowered courts to adopt rules aimed at expediting Family Court Act article 10-a appeals (see Family Ct Act § 1121 [1]; [7]), and that our courts have successfully navigated expedited appeals in the election law context, such changes to the appellate process are more appropriately addressed through administrative or legislative means.
Finally, we note, contrary to the mother's suggestion, there is no evidence that appellate courts reflexively dismiss appeals from permanency hearing orders for mootness. Where the Appellate Division considers issues within the permanency hearing context sufficiently novel and substantial, that Court often invokes the mootness exception and addresses those issues on the merits (see e.g. Matter of Malachi B. [Administration for Children's Servs.], 228 AD3d 570, 570-571 [1st Dept 2024]; Matter of Lacee L. [Stephanie L.], 153 AD3d 1151, 1151 [1st Dept 2017], affd 32 NY3d 219 [2018]; Matter of Cleophus B. [Torrence B.], 93 AD3d 1241, 1241-1242 [4th Dept 2012], lv denied 19 NY3d 807 [2012]; Matter of Latanya H. [Halvorsen], 89 AD3d 1528, 1529 [4th Dept 2011]; Matter of Heaven C. [Julia B.], 71 AD3d 1301, 1302 [3d Dept 2010]; see also Matter of Shawn S., 163 AD3d 31, 33 [4th Dept 2018]; Matter of Dakota F. [Angela F.], 92 AD3d 1097, 1098 n 2 [3d Dept 2012]). There is simply no support for the mother's claim to the contrary.
Accordingly, the orders of the Appellate Division should be affirmed, without costs.

WILSON, Chief Judge (dissenting):

I write separately because I do not believe this appeal is moot; were it moot I would join fully in Judge Rivera's dissent. There has been no final disposition in Tameka's case. In both of the orders she has appealed, Tameka asserts the court erred by continuing foster care placement rather than returning her children. At least one of those errors—the Referee's determination that she was powerless to return the children to Tameka—is admitted by all the parties. That, as well as other errors, tainted the subsequent proceedings because the failure to return her children prevented Tameka from developing a record that could have been used in future proceedings to demonstrate that her children were not at risk of abuse or neglect in her care, and served to decrease the later likelihood that her children would ever be returned (see Veronica P. v Radcliff A., 24 NY3d 668, 671 [2015] ["the appeal is not moot if an appellate decision will eliminate readily ascertainable and legally significant enduring consequences that befall a party as a result of the order which the party seeks to appeal"]). Because the initial errors tainted later determinations—and because the later determinations continued the placement of her children in foster care—I would hold that Tameka's appeal is not moot, and remand to the Appellate Division to resolve her challenges on the merits.[FN1]
I.
In 2018, Tameka J., a mother of four children, left her 14-year-old daughter in charge of her younger siblings. The daughter fell asleep, and, on two occasions, the 5-year-old was found wandering outside their home. The Westchester County Department of Social Services filed a neglect petition seeking to remove all of Tameka's children. The petition also alleged that Tameka once allowed her 11 and 9-year-old sons to take the bus together, to come to her work. Based on those three incidents, all four children were removed from her care and placed in foster care. Tameka is a single mother who works full-time at a mental-health center. (She sometimes relied on her 14-year-old to care for her younger children after school until she returned from work between 7:30 and 8:30pm). Throughout the proceedings, Tameka has remained involved in her children's lives and consistently expressed her desire to bring them home. This appeal concerns the middle two children, Christopher and Joshua. The permanency goal has always been to return to Christopher and Joshua to their mother.
It is now seven years later, and Christopher and Joshua have not been returned to her, nor has any court determined that she can never have them back. Instead, they have been in foster care [*6]limbo, with the two brothers separated from each other. During that time, Tameka has participated in at least eight permanency hearings. Each has resulted in the extension of foster placement. Tameka has appealed from six of those hearings, but no appellate court has ever entertained the merits of her appeal, because each time, the Appellate Division has dismissed her appeal as moot, on the ground that a subsequent permanency hearing had taken place. Tameka has no ability to avoid the periodic permanency hearings, they are required by law, and they would occur even if she chose not to participate. The dispositional hearing, which began in March 2019, remains pending. While Tameka has been waiting for her case to be resolved, two of her children have turned 18 and aged out of the system. Christopher, who was 11 years old when he was put in foster care, recently turned 18. Joshua, who was 9 when he was removed, is now 16.
Those facts would be troubling anywhere, but they are especially concerning in New York, where the Legislature passed laws precisely to prevent what happened in this case. Compared to many other states, New York mandates more frequent permanency hearings (Family Court Act § 1089 [a] [2] - [3]). Unlike many other states and especially important in this case, New York grants parties the right to appeal, on an expedited basis, the orders issued in permanency hearings (id. §§ 1112; 1121).
As this case illustrates, that right to appeal has proven illusory. Because of the six-month timeline for new hearings, by the time the Appellate Division hears an appeal, inevitably, a superseding permanency hearing has taken place and a subsequent order has been issued. The overwhelming practice of the Appellate Division has been, as here, to dismiss permanency hearing appeals as mooted by subsequent permanency orders and to refuse to entertain them on the merits (see infra Part III).
That practice is wholly inconsistent with the Family Court Act, which not only grants a right to appeal intermediate orders (which is not being honored), but also specifically outlines a procedure for expedited treatment of those appeals (which is being completely ignored) (id. § 1121). The consequences for families are dire. Given the delays and challenges in reaching a final disposition, in many cases, a permanency hearing is the only opportunity, after the initial removal hearing, for a parent to be reunified with a child who has been removed. The absence of meaningful appellate review has both allowed systemic failures to go unchecked and permitted errors to carry over in subsequent hearings, further delaying parents' hopes of ever being reunited with their children. The majority condones that practice, disregarding both the plain language of the statute and the clear legislative intent. Its decision has adverse consequences not only for parents, but also for the State, which has an economic interest in preventing children from remaining in foster care longer than necessary.[FN2]
II.
New York's foster care scheme is structured to uphold and safeguard the fundamental rights of parents to the care, custody, and control of their children (Matter of Jamie J., 30 NY3d 275, 279 [2017], citing Matter of Michael B., 80 NY2d 299, 308-309 [1992] ["'Looking to the child's rights [*7]as well as the parents' rights to bring up their own children, the Legislature has found and declared that a child's need to grow up with a normal family life in a permanent home is ordinarily best met in the child's natural home'"]; see Matter of Marino S., 100 NY2d 361, 372 [2003] ["It has long been the public policy of this State to keep biological families together and to require foster care agencies to exercise diligent efforts to reunite abused and neglected children with their birth parents, once rehabilitated"]).
Permanency hearings are a crucial part of that statutory scheme. After the court determines a child should be removed, the court sets a date for an initial permanency hearing, which must occur within eight months of removal, and every six months thereafter (id. § 1089 [a] [2] - [3]). At each permanency hearing, among other requirements, the court must determine whether a child in foster care can be released from placement and returned "to the parent or other person legally responsible for the child's care," and, if the child will not be returned, the court must determine whether the agency made "reasonable efforts . . . to eliminate the need for placement" and "enable the child to safely return home" (id. § 1089 [d] [1], [d] [2] [iii] [B]).
That requirement has constitutional dimensions. As we have long held—and recently reaffirmed in Matter of Jamie J. (30 NY3d 275, 285 [2017])—when the original reasons for a child's removal no longer apply, such as when the State has failed to prove neglect or abuse, Family Court lacks jurisdiction to issue orders or impose conditions on a child's release (see Matter of Tammie Z., 66 NY2d 1, 4-5 [1985] ["If abuse or neglect is not proved, the court must dismiss the petition . . . at which time the child is returned to the parents"]; Matter of Male Infant L., 61 NY2d 420, 427 [1984] ["For once it is found that the parent is fit . . . the inquiry ends and the natural parent may not be deprived the custody of his or her child"]).
The same logic applies to when parents have remedied the conditions that led to the initial removal. As the United States Supreme Court has recognized, parents' rights "do[] not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State" (Santosky v Kramer, 455 US 745, 753 [1982]). To the contrary, "parents retain a vital interest in preventing the irretrievable destruction of their family life," and, "[i]f anything, they have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs" (id.)[FN3].
Reflecting the need to protect parents' rights, federal law requires, as a condition of federal funding, that states hold a "permanency planning hearing" within 14 months of a child's placement in foster care, and every 12 months thereafter (see 42 USC § 675[5][C]). Permanency hearings are not review hearings; the purpose is not merely to review case progress, but to determine a child's permanent placement (id. ["(the) hearing shall determine the permanency plan for the child that includes whether, and if applicable when, the child will be returned to the parent"]; see National Council of Juvenile and Family Court Judges, Resource Guidelines: Improving Court Practice in [*8]Child Abuse & Neglect Cases 78 [1995] ["Resource Guidelines"] ["A review hearing is to oversee case progress; a permanency planning hearing is to make a definitive long-term decision"]; see also USC § 675[5][C][iii] [requiring "procedural safeguards" at permanency hearings]).[FN4]
Federal law sets a floor. New York's permanency hearing framework deliberately provides protections beyond what federal law requires. New York's 2005 "Permanency Bill" was enacted to ensure that children placed out of their homes did not "stay needlessly in foster care," and to provide them with "timely and effective judicial review that promotes permanency, safety and well-being in their lives" (Senate Introducer's Mem In Support, Bill Jacket, 2005 S.B. 5805, Ch. 3, at 61; FCA § 1086; see also Matter of Jamie J., 30 NY3d at 284-286)[FN5]. In addition to other changes,[FN6] the 2005 amendments increased the frequency of permanency hearings, previously required only annually in accordance with the federal mandate, to require hearings every six months (id. § 1089 [a] [2] - [3]).
In contrast to many other states, which do not permit appeals of permanency hearing orders, New York's Family Court Act expressly provides that the order resulting from a permanency hearing is appealable as of right (id. § 1112 ["An appeal from an intermediate or final order in a case involving abuse or neglect may be taken as of right to the appellate division of the supreme court" [emphasis added])[FN7]. The right to appeal permanency orders serves as a vital safeguard and is consistent with the Legislature's intent—to create a forum "for a more thoughtful and substantive review of the issues that gave rise to foster care and that may be creating barriers to reunification or other permanency for the child" (Senate Introducer's Mem In Support, Bill Jacket, 2005 S.B. 5805, Ch. 3, 62; see also dissenting op at 3-4 [Rivera, J.] ).
III.
The Appellate Division dismissed both of Tameka's appeals as moot on the ground that each of the orders had expired and had been superseded by subsequent permanency hearing orders (see 220 AD3d 776, 777 [2d Dept 2023]; 220 AD3d 777, 778 [2d Dept 2023]).
Tameka's case reflects the common practice: across Departments, the overwhelming practice of the Appellate Division has been to dismiss as moot appeals of permanency orders that have expired or were succeeded by subsequent determinations (see e.g. Matter of Gabrielle N., 139 AD3d 504 [1st Dep't 2016]; Matter of Victoria B., 164 AD3d 578, 580 [2d Dep't 2018]; Matter of Cheyeanne E., 154 AD3d 1206 [3d Dep't 2017]; Matter of Destiny F., 217 AD3d 1400 [4th Dep't 2023]).[FN8]
The system of perpetual mootness defies the plain text and legislative purpose of the Family Court Act, which not only provides a statutory right to appeal, but also sets out a procedure for expediting appeals. FCA § 1121 specifically provides that, for Article 10-A proceedings—which include permanency hearings—counsel for the parties and for the child must promptly notify the client of the right to appeal and the expedited appeal processes required in that section. Unlike a preference, which merely expedites the calendaring of a perfected case (see e.g. CPLR 5521[b]), an expedited appeal under § 1121 accelerates the entire appellate process by imposing strict deadlines at each stage. Specifically, the statute requires that transcripts must be ordered within 10 days of assignment of counsel and completed within 30 days of receipt of the order; counsel must then perfect the appeal within 60 days of receiving the transcript (FCA § 1121 [6] [b], [7]; see Merril Sobie, Practice Commentaries, McKinney's FCA § 1121 ["The thirty day rule is absolute"]). To prevent transcript delays from frustrating appeals, the statute empowers courts to adopt procedures to ensure timely preparation (FCA § 1121 [7]). It also requires the Appellate Division Departments to adopt rules governing the "expeditious" filing of briefs (id.). It is unreasonable to expect that the legislature required that permanency determinations be treated with extreme expedition on appeal with expectation that they would be expedited to dismissal. Instead, the legislature provided expedited treatment so that the appeals would be decided before the next six-month period occurred.[FN9]
The majority posits that the six-month schedule "reflects an understanding that the circumstances of a child or parent may change rapidly, requiring a change in permanency goal," and that appellate review of the merits "risks undermining the purpose of article 10-a by injecting unnecessary uncertainty into the life of the child" (majority op at 9). If that had been the Legislature's conclusion, it would not have provided for appeal of permanency hearings or would have limited the appeals to cases in which a hearing changed the permanency goal.
Indeed, the majority is substituting its own judgment as to the desirability of merits appeals of permanency hearings for the Legislature's determination. The 2005 amendments introduced the requirement for more frequent permanency hearings as part of an effort to increase judicial oversight and improve decision-making to facilitate permanency for children placed out of their homes (see e.g. Senate Introducer's Mem In Support, Bill Jacket, 2005 S.B. 5805, Ch. 3, 62 ["These planned-for permanency hearings will provide a forum for a more thoughtful and substantive review of the issues that gave rise to foster care and that may be creating barriers to reunification or other permanency for the child"]).
As a fallback, the majority contends that requiring courts to decide the merits of permanency hearing appeals is "not workable or prudent" and "would unnecessarily flood appellate courts with appeals" (majority op at 9). I offer three responses. First, I fully agree with my dissenting colleague that if, as the majority suggests, our appellate courts already look to the merits of an issue to gauge whether it is "substantial or novel" enough to apply a mootness exception, it would not be much more work to decide that issue on the merits; Appellate Division decisions are often quite short (see majority op at 6; see also dissenting op at 16-17 [Rivera, J.]). Second, the majority provides no basis for why a rule expediting appeals for permanency hearing orders is unworkable, when expedited appeals are implemented in other contexts, such as election law, without issue.[FN10]
Third, and most importantly, our role is to interpret the law and assess whether courts are applying it correctly [FN11]. We cannot disregard the plain text of the law simply out of concern it might [*9]increase courts' workload. If the Legislature has created too much work for courts, that is for the Legislature to address, either by providing more specifics on how appeals should be expedited, by creating more judgeships, or, if it so chooses, by limiting the right to appeal. At bottom, the majority's rationale is that when courts are too busy, they can assert that as a justification to nullify a right explicitly granted by the Legislature (and which due process may require) (see Matter of Regina Metro. Co., LLC v New York State Div of Hous. & Community Renewal, 35 NY3d 332, 348 [2020] ["It is the distinct role of the courts to interpret the laws to give effect to legislative intent while safeguarding the constitutional rights of impacted individuals"]; see also Mathews v Eldridge, 424 US 319 [1976]).
IV.
Although I agree with my dissenting colleague that as to Christopher, who has aged out of Family Court's jurisdiction with respect to custody, this case fits into the mootness exception, insofar as the orders affect Joshua as well, it is unnecessary to reach the exception because the orders appealed from are not moot. Tameka appeals from two orders: one issued by a Family Court judge in March 2022, and the other issued by a referee in October 2022. In both cases, Tameka claims the court erred in failing to return her children. Neither order was mooted by subsequent proceedings, because in both, the claimed errors carried over into future proceedings.
"Where . . . a judicial determination carries immediate, practical consequences for the parties, the controversy is not moot" (Saratoga Cnty. Chamber of Commerce v Pataki, 100 NY2d 801, 812 [2003]; see Matter of Grand Jury Subpoenas for Locals 17, 135, 257 & 608 of the United Bhd. of Carpenters & Joiners of Am., AFL-CIO, 72 NY2d 307, 311, [1988] ["(A)n appeal is not rendered moot if there remain undetermined rights or interests which the respective parties are entitled to assert"]; see also Matter of Hearst Corp. v Clyne, 50 NY2d 707, 713-714 [1980]; People ex rel. Geer v City of Troy, 82 NY 575, 575 [1880] ["The Court of Appeals will not decide mere abstract questions from the determination of which no practical result can follow"]).
First, the October 2022 order issued by the referee was not moot, because the error repeated in subsequent proceedings and had continuing effects. As DSS concedes, the referee erred in concluding she lacked power to return the children to Tameka so long as the dispositional determination was still pending [FN12]. FCA § 1089(d) lists the options available in permanency hearings, the first of which is returning the child to the parent:
"At the conclusion of each permanency hearing, the court shall, upon the proof adduced, and in accordance with the best interests of the child, including whether the child would be at risk of abuse or neglect if returned to the parent or other person legally responsible, determine and issue its findings, and enter an order of disposition in writing: (1) directing that the placement of the child be terminated and the child returned to the parent [*10]or other person legally responsible for the child's care with such further orders as the court deems appropriate . . . ."
The referee clearly made an error of law in holding that she lacked the power to return the children; her conclusion is flatly at odds with the statutory language, clear statutory purpose, and the constitutional requirement to return children to their parents (see e.g. Matter of Jamie J., 30 NY3d 275, 285 [2017]). The referee repeated that error in at least one subsequent hearing. However, even setting aside that hearing, the error infected the other proceedings as well. Because the referee ruled she had no authority to return Tameka's children, Tameka's counsel explained to the referee that although he had proof he intended to offer, he would not do so because the referee said she was powerless to return the children no matter what the evidence showed. As a result, the error carried over into the subsequent permanency hearings, leading to a less developed record and undermining Tameka's continued efforts to seek the return of her children.
Second, although the March 2022 order occurred before the referee's statement and was not itself affected by it, that order was also not moot, because the failure to return her children itself prevented Tameka from developing a record in subsequent proceedings. Had her children been returned, as she argued they should have been, she would have had the opportunity to demonstrate that they were not at risk of abuse or neglect in her care (see e.g. § 1089 [d] [directing courts to consider at each permanency hearing "whether the child would be at risk of abuse or neglect if returned to the parent or other person legally responsible"]). Alternatively, if the return had not gone well and there was further evidence of neglect, the court and agency would have had a more fully developed record to support continued placement at future permanency hearings. The failure to return had lasting consequences in another respect: It compounded the harm caused by the initial separation and potentially undermined the attachment interest in reunification. Although both the Legislature and courts have long recognized that reunification is the preferred outcome, children have an obvious interest in maintaining relationships with caregivers to whom they have become attached [FN13]. When reunification remains the stated goal and has not been achieved, the initial error continues to cause harm by eroding the child's attachment to the parent. Each subsequent permanency hearing that failed to reunite Tameka with Christopher and Joshua only compounded the harm.
In sum, the appeals were not moot, because the orders had profound, lasting implications on subsequent proceedings. The harm resulting from the errors was not merely speculative and continued to impact Tameka's rights in subsequent proceedings. The majority's observation that the admitted errors occurred several years ago goes not to mootness, but to the nature of the remedy, and further drives home the point that the legislative command for highly expedited appeals is being [*11]flouted (see majority opinion at 5)[FN14]. Moreover, because no dispositional order has yet been entered and no final determination made in her case, Tameka's rights remain active and will be directly affected by today's decision (see Heart Corp., 50 NY2d 707, 714 [1980] ["An appeal is not moot if "the rights of the parties will be directly affected by the determination of the appeal and the interest of the parties is an immediate consequence of the judgment"]).
V.

The referee's error was the most flagrant, but not the only error, in these proceedings.[FN15]
Tameka contends that the court failed to obtain her consent to proceed before a referee, as required under New York Judiciary Law § 117 (which permits proceedings to be submitted to a referee only by stipulation of the appearing parties or by court order). The record does not contain any stipulation or order referring the case to a referee, and counsel for the Westchester DSS had no knowledge of the existence of either, so the proceedings before the referee appear to be entirely invalid.
She also contends that the court improperly excluded her then-13-year-old son Joshua from one of the hearings without making the requisite findings under Family Court Act § 1090 (a) (2) regarding the exclusion of a child under the age of 14. The record does not contain the statutorily mandated findings, and therefore Joshua's exclusion from the proceedings appears to have been unjustified (Joshua stated on the record that he wished to attend the proceedings in their entirety).
Like the Appellate Division, the majority leaves these (and the other merits issues) for another day that, because of the majority's holding, will never come. We are left, therefore, with a system in which Family Courts make errors that affect family reunification, the Legislature has mandated super-expedited appeal of those decisions, but they are not reviewable because we deem them moot, to avoid a purported flood of appeals.
The practice above disproportionately impacts marginalized families. Racial and socioeconomic disparities in the child welfare system are striking and well-documented. Nonwhite children are overrepresented in foster care and are disproportionately subjected to invasive state [*12]action across the stages of a child protection case [FN16]. Low-income families are also much more likely to become subject to the child protection system.[FN17]
The flaws in the Family Court system are on full display in this case. Tameka was accused of neglect because she asked her 14-year-old daughter to babysit her other children and allowed her 9- and 11-year-old sons take the bus to meet her at work. Ask yourself how many middle-class suburban families would be accused of child neglect and had all their children placed into foster care based on those facts. Instead of providing financial assistance for child-care, or helping her arrange alternative transportation, DSS removed her children. For nearly seven years, the system spent far more—on foster care, court proceedings, and hearings—than it would have cost to help this family from the start. A better system would not have treated her family this way. A better system would have provided immediate appellate review instead of none.
VI

The straightforward interpretation of the Family Court Act is that it provides for regular permanency hearings and gives parents an ability to challenge a permanency hearing order on a highly expedited appeal. Instead, an infinite loop of mootness perpetuates systemic delays and maintains families in limbo until children age out of the system and the appeal becomes truly moot.
The majority's explanation that our hands are tied cannot be the right answer. It is unfathomable that the Legislature intended this. I would hold simply that a parent who, as here, claims there has been an error in continuation of foster placement for a child, when the ultimate permanency goal is to return the child, may continue to pursue an appeal even if there has been a subsequent permanency determination, unless that subsequent permanency determination returns the child to the parent, or there has been a final order of disposition (which itself would be appealable). Because the orders appealed from are not moot (or even if they are, as my dissenting colleague explains), I would reverse the Appellate Division and remit for it to evaluate the merits of the claims Tameka has raised on appeal.
RIVERA, J. (dissenting):
The article 10 Family Court proceedings against respondent mother have continued for over six years without any resolution. Throughout that time, mother's children have been in the foster care system administered by the Westchester County Department of Social Services (DSS). Mother's case exemplifies the protracted litigation that is all too common in New York's Family Courts, undermining stability for children and stalling family reunification as children languish in foster care.
The Legislature sought to remedy the deep-rooted problems of long-term foster care placements and the attendant delays to family reunification by ensuring timely Family Court oversight of cases where children have been removed from the home. To that end, it enacted Family Court Act § 1089, which provides for permanency hearings to review continued placement of children outside the home (FCA art 10-A; FCA §§ 1086-1089). As required by law, Family Court must hold these hearings every six months until the child is reunified with the parent or an alternative permanency plan is adopted (FCA § 1089).
In mother's case, there have been numerous permanency hearings over the years, each continuing the placement of her children in foster care. Mother appeals from orders issued at two of those hearings. In one, the presiding referee concluded that they had no power to grant mother's [*13]request for return of the children to her care because, at the time, the Family Court judge had not issued a disposition order. The Appellate Division dismissed mother's appeals, which had been pending for over a year, as moot because the relevant permanency orders had expired by the time she appeared before that court. Mother argued that they should apply a mootness exception to reach the merits of the appeals, and the Appellate Division declined to do so. That was error. The dismissed appeals fall squarely within the mootness exception for substantial and novel issues that are likely to recur and typically evade review (see Hearst Corp. v Clyne, 50 NY2d 707, 714-715 [1980]). Mother's appeals presented at least two open questions: (1) whether a Family Court referee has authority in a pre-disposition permanency hearing to order a child's return to their parent; and (2) whether a blanket exception to mootness applies to at least some expired permanency orders in a pending Family Court matter.[FN1] These issues are of statewide importance and implicate a parent's constitutional right to custody of their children (see Matter of Jamie J., 30 NY3d 275 [2017]; Nicholson v Scoppetta, 3 NY3d 357, 380 [2004]). The Appellate Division abused its discretion when it failed to invoke the mootness exception to address these issues.
I.
"A biological parent has a right to the care and custody of a child, superior to that of others, unless the parent has abandoned that right or is proven unfit to assume the duties and privileges of parenthood, even though the State perhaps could find 'better' parents" (Matter of Jamie J., 30 NY3d at 279, quoting Matter of Michael B., 80 NY2d 299, 308-309 [1992]). "Those rights are among our oldest and most fundamental and are not only provided by statute, but also guaranteed to parents and children by our State and Federal Constitutions" (id. at 280). Family Court proceedings must protect those rights, as well as the rights of children.
Pursuant to the FCA, "[t]he initial permanency hearing shall be commenced no later than six months from the date which is sixty days after the child was removed from [their] home," and:
"[s]ubsequent permanency hearings for a child who continues in out-of-home placement or who is freed for adoption shall be scheduled for a date certain which shall be no later than six months from the completion of the previous permanency hearing and such subsequent permanency hearings shall be completed within thirty days of the date certain set for such hearings" (FCA §§ 1089 [a] [2] - [3]).
"The permanency hearing shall be completed within 30 days" (FCA § 1089 (a) [2]). "Permanency hearings are intended to be automatically expedited" (Merril Sobie, Practice Commentaries, McKinney's Cons Laws of NY, 2021 Electronic Update, FCA § 1089). That intent ensures that a child who can be reunified with their parent does not "stay needlessly longer in foster care" (Senate Introducer's Mem. in Support, Bill Jacket, L 2005, ch 3 at 61). Permanency hearings were designed to provide ongoing oversight, and, crucially, ongoing jurisdiction and authority to act in the child's best interest. In fact, the Legislature anticipated that, "[s]imply providing the Court with continuing jurisdiction should reduce by [*14]months the time a child spends in foster care" (id. at 62 [emphasis added]).
To facilitate the implementation of an appropriate permanency plan, section 1089 requires preparation of a comprehensive up-to-date hearing report describing "the child's current permanency goal, which may be [ ] return to the parent or parents," among other options (FCA § 1089 [c] [1] [i]).[FN2] The report must also include "a description of the reasonable efforts to achieve the child's permanency plan that have been taken by the local social services district or agency since the last hearing" (FCA § 1089 [c] [4]). "Unless the child is freed for adoption or there has been a determination by a court that such efforts are not required, [the report shall describe] the reasonable efforts that have been made by the local social services agency to eliminate the need for placement of the child and to enable the child to safely return home" (id.). The social services district or agency must serve the report no later than 14 days before the hearing on the parent and their attorney, parties responsible for the child's care, and the attorney for the child (FCA § 1089 [b] [1] [i] - [iii]).
Section 1089 provides for judicial oversight to ensure the expeditious disposition of the child's placement, including return to the parents:
"At the conclusion of each permanency hearing, the court shall, upon the proof adduced, and in accordance with the bests interest and safety of the child, including whether the child would be at risk of abuse or neglect if returned to the parent or other person legally responsible, determine and issue its findings and enter an order of disposition in writing:
"(1) directing that the placement of the child be terminated and the child returned to the parent or other person legally responsible for the child's care with such further orders as the court deems appropriate; or
"(2) where the child is not returned to the parent or other person legally responsible" (FCA §§ 1089 [d] [1] - [2]).
Throughout the process, reunification with the parent is a priority, if appropriate under the circumstances (id.). Thus, the court must determine whether the permanency goal should be to return the child to the parent(s), or to pursue one of the statutory alternatives:
"(A) return to parent;
"(B) placement for adoption with the local social services official [*15]filing a petition for termination of parental rights;
"(C) referral for legal guardianship;
"(D) permanent placement with a fit and willing relative; or
"(E) placement in another planned permanent living arrangement that includes a significant connection to an adult willing to be a permanency resource for the child if the child is age sixteen or older [and other conditions are met]" (id. § 1089 [d] [2] [i]).
The court must also determine whether the social services district or agency made the required reasonable efforts to achieve the permanency goal (id. § 1089 [2] [iii]). The court may, as it deems appropriate, order services tailored to the needs of the child and the family to achieve the permanency plan (id. § 1089 [d] [2] [viii] [A]). This may include "an order directing a local social services district or agency to undertake diligent efforts to encourage and strengthen the parental relationship when it finds such efforts will not be detrimental to the best interests of the child and there has been no prior court finding that such efforts are not required" (id. § 1089 [d] [2] [viii]).
Despite the best intentions of the Legislature, the judiciary, and advocates, delays are endemic in the Family Courts, impacting this comprehensive permanency framework and the primary goal of reunification. When there is a case opened against a parent, the Family Court holds a fact-finding hearing to decide whether the child has been abused or neglected. If so, then the Family Court schedules a dispositional hearing to hear evidence and determine the most appropriate placement for the child. Permanency hearings were designed to be periodic, ongoing checks throughout this process to ensure whether the child is placed in the best interest of the child. However, one study found that only half of all cases statewide had a dispositional hearing before the first permanency hearing, and 32% of cases had a permanency hearing take place before any dispositional hearing (New York Quality Permanency Hearings, Statewide Findings Report, https://ww2.nycourts.gov/sites/default/files/document/files/2018-10/CWCIP_Statewide_findings_report.pdf). The average statewide time to disposition was 203 days, and the average time from removal to closure of the case was 2.78 years, with many cases including delays much longer than this average (id. at 19, 25); see also New York State Senate Comm. on the Judiciary, et al., The Crisis in New York's Family Courts 21, 23, 29 [Feb. 2024], https://www.nysenate.gov/sites/default/files/admin/structure/media/manage/filefile/a/2024-02/2.12-family-court-hearing-report-w-graphics-1.pdf [noting "undue delays, where cases drag on for multiple years with no fact-finding"]).
II.
As relevant to this appeal, in 2018, two of mother's children were removed. On consent, Family Court entered an order of neglect. Family Court issued several pre-dispositional permanency orders, meaning the court had not made a final determination on the permanency plan. Indeed, the disposition hearing commenced in 2021 and had not been completed three years later. During the pendency of the disposition hearing, the permanency hearings continued. Mother represents that at least eight orders have been issued, all of which were appealed.
At one of the first two hearings, mother requested return of the children. The presiding referee stated that they had no authority to grant that relief. Based on the referee's legal conclusion, mother's counsel determined not to put forward evidence that mother claims would have supported [*16]her request for the children to return home. She appealed the resulting permanency order continuing placement. While that appeal was pending, Family Court held the next permanency hearing, which resulted in another order continuing placement. Mother appealed that order. During the year while these appeals were pending in the Appellate Division, Family Court issued two subsequent permanency orders.[FN3] The Appellate Division concluded that mother's two appeals were moot because the relevant permanency orders had expired (see 220 AD3d 776, 777 [2d Dept 2023]; 220 AD3d 777, 778 [2d Dept 2023]). The Court rejected mother's request to invoke the mootness exception in both appeals.
Mother concedes that the two adverse permanency orders denying return of her children expired during the pendency of her appeals before the Appellate Division and that, as a consequence, the appeals are moot. However, she argues that the mootness exception applies, and that her arguments would prevail on the merits. She further asserts that the Court should recognize a judicial exception to mootness on appeals from Family Court's extension of foster care placement, as necessary to effectuate the FCA's statutory right of appeal. DSS responds that there is nothing substantial or novel about the regular mooting of permanency order appeals, and that applying a blanket mootness exception would serve no purpose other than flooding the courts. DSS also argues that, in any event, the permanency determinations below were supported by sound and substantial record evidence.[FN4]
III.
A.
"It is a fundamental principle of our jurisprudence that the power of the court to declare the law only arises out of, and is limited to, determining the rights of persons which are actually controverted in a particular case pending before the tribunal" (Hearst Corp., 50 NY2d at 713 [citations omitted]). Thus, courts may not "consider[] questions which, although once live, have become moot by passage of time or change in circumstances" (id. at 714). "[A]n appeal will be considered moot unless the rights of the parties will be directly affected by the determination of the appeal and the interest of the parties is an immediate consequence of the judgment" (id.). However, we have recognized an "exception to the [mootness] doctrine which permits the courts to preserve for review important and recurring issues which, by virtue of their relatively brief existence, would be rendered otherwise nonreviewable" (id.). The exception applies when the moot issue is likely to recur, typically evades review, and involves "a significant or important question[] not previously passed on, i.e. substantial and novel" (id. at 715; Alcantara v Annucci, 42 NY3d 142, 147 [2024]; [*17]People ex rel. Johnson v Supt., Adirondack Corr. Facility, 36 NY3d 187, 195-196 [2020]).[FN5] We review an Appellate Division's decision not to invoke the mootness exception under an abuse of discretion standard (see Prisoners' Legal Servs. of N. Y. v N.Y. State Dept. of Corr. & Community Supervision, 42 NY3d 936, 937 [2024]).
B.
The only question before us is whether the Appellate Division abused its discretion in refusing to invoke the mootness exception, first, to assess the scope of the referee's authority to order return of the children to mother before the Family Court's issuance of a disposition order, and, second, to ensure appellate review of at least some permanency orders appeals from which might otherwise be moot.[FN6]
These issues implicate a parent's constitutional right to custody (see Matter of Jamie J., 30 NY3d at 280). And neither this Court nor the Appellate Division has opined on these matters. Significantly, mootness dismissals of orders from permanency hearings, which by law must be held every six months may, as mother asserts, undermine the legislative intent of reunification and, instead, extend foster care placements. Therefore, the Appellate Division abused its discretion in declining to invoke the mootness exception to consider these issues of statewide importance, resolution of which would impact large numbers of parents and children.
C.
Turning to the scope of the referee's authority in a permanency hearing to order the return of the children, the majority erroneously concludes that the mootness exception does not apply because this open question is not likely to recur (majority op at 7-8). That assertion is belied by the record here, where the referee throughout the permanency hearings adhered to their determination that they lacked authority to grant the relief requested by mother.[FN7] Moreover, we have never held that the exception only applies to a "new statute," as suggested by the majority (id.). Nor is it [*18]dispositive that mother "does not raise a systemic problem in the Family Court" (id.). The question presented by mother's appeals is not whether the referee misapplied an established interpretation of the FCA, but rather the scope of that authority given the lack of caselaw defining a referee's power at a permanency hearing before Family Court has issued a disposition order. Given the lack of a definitive answer to this question and the short life span of permanency orders, the referee's misinterpretation of the law (if it is a mistake) may recur and is likely to evade review. Apparently, this question escaped review of DSS and the Family Court Judge. Moreover, this potential error is compounded at each permanency hearing because a parent, such as mother, has no opportunity to present evidence supporting an argument for return of the children as it develops during the course of the Family Court proceedings, thus prolonging those proceedings. And the longer the Family Court proceedings continue and the children are separated from their parents, the more difficult to achieve the goal of reunification—the same goal ordered by the Family Court here (see American Academy of Pediatrics, Committee on Early Childhood, Adoption and Dependent Care, Developmental Issues for Young Children in Foster Care 106 Pediatrics 1145, 1146 [Nov. 2000], available at https://www.umassmed.edu/globalassets/faces/documents/fostercare-general/ developmental-issues-for-young-children-in-foster-care.pdf [noting that the longer a child's placement is extended, the more harm accrues]).
D.
The majority appears to concede that the Appellate Division should have considered a blanket application of the mootness exception to appeals from permanency orders and addresses that question on the merits (see majority op at 7 n 3). Given the novelty and significance of the issue, that these orders expire within six months or fewer, that many expired orders have lasting effects in the Family Court proceedings, and that orders are nearly certain to expire during a lengthy appellate process, the Appellate Division abused its discretion in declining to invoke the exception and reach the merits. I would remit for the Appellate Division to consider both the legal ramifications and practical implications of a blanket exception for mootness purposes. The Appellate Division's extensive experience with these cases can inform its analysis. In fact, the majority relies on intermediate appellate courts' experiences to reach its own conclusion in these appeals to reject an exception, regardless of the continuing relevance of a permanency order (id. at 6-7). I believe we would benefit from the Appellate Division's initial views on the matter.
Even if I agreed that we should resolve this issue in these appeals, I would not adopt the majority's analysis. First, the majority's reliance on Matter of David C. (69 NY2d 796, 798 [1987]) is misplaced. That case does not support rejection of the mootness exception here (majority op. at 7). Matter of David C. is a short memorandum decision regarding the right to a "rehearing" of retention order pursuant to Mental Hygiene Law § 15.35, not a direct appeal from a permanency order issued under FCA § 1089. Further, the Matter of David C. language quoted by the majority cites to Matter of Barbara C.—where this Court dismissed the appeal in an entry for lack of preservation below—and Matter of Hearst (id. at 798, citing Matter of Barbara C., 64 NY2d 866, 868 [1985]). Neither case stands for the broad proposition promoted by the majority.
Second, the majority's further reliance on Appellate Division caselaw is similarly unavailing. In Matter of Dakota F. [Angela F.], the Appellate Division applied an exception to the mootness doctrine to address the Family Court's imposition of contradictory permanency goals, noting that "this is not the only time that Family Court has improperly ordered concurrent permanency goals" (92 AD3d 1097, 1099 n 3 [3d Dept 2012]). Matter of Damani B. [Theresa M.] (174 AD3d 524, 527 [*19][2d Dept 2019]) solely serves as an example of the Appellate Division reviewing a live claim as to whether a Family Court's determination was supported by a "sound and substantial basis in the record." Under the majority's view, we would never have occasion to take corrective action to address errors from permanency hearings such as those alleged here. If the Appellate Division determined the challenge was moot because it lacked merit and dismissed without invoking the exception, then we would not grant leave because, according to the majority, the Appellate Division did not abuse its discretion.
Finally, the majority's assertion that "there is no evidence that appellate courts reflexively dismiss appeals from permanency hearing orders for mootness" (majority op at 10) lacks support in the record or the cases cited. The parties have presented no data to support that conclusion. In fact, the few occasions in which the Appellate Division has invoked the mootness exception for Family Court cases have mostly involved similar questions of jurisdiction and decision-making authority raised by permanency orders (Matter of Malachi B. [Admin. for Children's Servs.], 228 AD3d 570, 570-571 [1st Dept 2024] [applying mootness exception to address whether "Family Court has the decision-making authority as to the appropriateness of the child's continued placement in a (Qualified Residential Treatment Program) at every permanency hearing"]; Matter of Cleophus B. [Torrence B.], 93 AD3d 1241, 1241-1242 [4th Dept 2012], lv denied 19 NY3d 807 [2012] [applying mootness exception to address whether Family Court had jurisdiction to impose conditions on father despite dismissing the neglect petition against him]; Matter of Shawn S., 163 AD3d 31, 33 [4th Dept 2018] [applying mootness exception to address the question of whether the court "lacked the authority to compel the child to be present at the permanency hearing]).
IV.
The merits of the underlying issues are not a factor in determining whether to invoke the mootness exception, except insofar as they bear upon whether a question is "substantial" (see Hearst Corp., 50 NY2d at 715; Alcantara, 42 NY3d at 147; People ex rel. Johnson v Supt., Adirondack Corr. Facility, 36 NY3d 187, 195-196 [2020]). Nevertheless, it bears noting that mother's arguments are significant and compelling.
DSS concedes that the referee's decision was error. Indeed, the FCA provides that at the end of each permanency hearing, the court must issue an order of disposition in writing, with the first dispositional option listed as, "directing that the placement of the child be terminated and the child returned to the parent or other such person legally responsible for the child's care with such further orders as the court deems appropriate" (FCA § 1089 [d] [1]). "Upon the proof adduced, and in accordance with the best interests and safety of the child" the court must evaluate the evidence and make a factual determination about whether to contemporaneously terminate the child's placement (FCA § 1089 [d]).
Mother makes a persuasive argument that a mootness exception for permanency orders is necessary so that the right to appeal those orders is not rendered illusory. Permanency hearings must take place every six months (FCA §§ 1089 [2]-[3]), and the resulting order is appealable as of right (FCA § 1112). On its face, a parent's appeal will in all likelihood be rendered moot by expiration of that time frame during the case's pendency.
Frequent mootness dispositions would also be contrary to the legislative intent. The permanency hearings process was designed to ensure prompt and ongoing judicial oversight to prevent children from being lost in the foster care system. We have noted that Article 10-A of the [*20]FCA, which outlines the permanency hearing process,[FN8] "establish[es] uniform procedures for permanency hearings for all children who are placed in foster care . . . [in order] to provide children placed out of their homes timely and effective judicial review that promotes permanency, safety and well-being in their lives" (Matter of Lacee L., 32 NY3d 219, 226 [2019]).
Nor is there any basis for the majority's conclusion that a blanket exception is "not workable or prudent" because it would "flood appellate courts with appeals" with moot issues that "have no real impact on the rights of the parties or the law of this State" (majority op at 9). There is no data to support the bald assertion that an exception would lead to a dramatic increase in appeals from permanency orders that would not have otherwise been filed, but for the exception, and that by comparison any additional appeals would be less meritorious. Moreover, if, as the majority assumes, the Appellate Division engages in a merits analysis as part of its mootness determination, then the court has already done the work that the majority says would be overburdensome. All that is required is to externalize the mootness analysis and address the merits where the issue falls within the mootness exception. In any case, the FCA provides for an appeal by right of a permanency order and the court is obligated to follow the law and avoid nullifying that right.[FN9]
For the reasons I discuss, I would reverse because even if the issues presented in mother's appeals are moot, the exception to mootness applies here. I dissent.
Orders affirmed, without costs. Opinion by Judge Troutman. Judges Garcia, Singas and Cannataro concur. Chief Judge Wilson dissents in an opinion, in which Judge Halligan concurs. Judge Rivera dissents in a separate dissenting opinion.
Decided May 20, 2025

Footnotes

Footnote 1: The mother's other two children were placed in different settings. Their placement is not at issue here.

Footnote 2: In the superseding order, Family Court continued the children's placement with DSS until the next permanency hearing, approved a permanency goal of reunification with the mother, and directed the mother to comply with the same mandates ordered in previous permanency hearing orders.

Footnote 3: We respectfully disagree with Judge Rivera's assertion that the Appellate Division abused its discretion by declining to review the "open question[ ]" of "whether a blanket exception to mootness applies to at least some expired permanency orders in a pending Family Court matter" (Rivera, J., dissenting op at 2-3). It is difficult to conceive why a court would need to invoke the mootness exception to address whether a blanket mootness exception exists. The blanket mootness exception proposed by the mother is a potential method by which an appellate court could review the merits of an expired permanency hearing order—not a justification for invoking the existing mootness exception in the first instance.

Footnote 4: While our dissenting colleagues correctly observe that the referee repeated the same ruling at one subsequent permanency hearing, we note that, according to the mother, the purported error has not since recurred.
Footnote 5: Contrary to Judge Rivera's suggestion, merely because one might determine that the mootness exception applies to these facts does not require this Court to hold that the Appellate Division erred as a matter of law. Absent an abuse of discretion, it is not the role of this Court to substitute its discretion for that of the Appellate Division.

Footnote 6: We further reject the notion that a blanket mootness exception should apply to "at least some" appeals from permanency hearing orders (Rivera, J., dissenting op at 3, 11). Initially, we note that narrowing the application of a blanket mootness exception is not a blanket mootness exception at all. Moreover, it is entirely unclear which permanency hearing orders would be subject to the exception and why our ordinary mootness exception is insufficient to determine which orders are reviewable on appeal.

Footnote 1: Christopher has turned 18 and the Family Court no longer has jurisdiction over him with respect to custody matters (see Family Court Act § 651 [a], [b]; id. § 119 [c]). Because the orders are moot as they pertain to Christopher, I join Judge Rivera's dissent regarding those portions of the orders.

Footnote 2: See Angela Olivia Burton, Introduction, 20 CUNY L Rev 1, 19 (2016) ("[T]he minimum cost to keep one child in foster care for a year in New York City is $30,000"); Lucas A. Gerber, et al., Effects of an Interdisciplinary Approach to Parental Representation in Child Welfare, 102 Child & Youth Servs Rev 42, 52 (2019) (discussing the potential cost-saving effects of vigorous parental representation that reduces children's stays in foster care by 118 fewer days on average and may save "millions of government dollars").

Footnote 3: Over a century ago, we articulated the rationale for that rule as follows:
"Intemperate parents are deemed to be unfit custodians of their children, and the state steps in and cares for and supports them for the time being. It now appears that the parents have reformed, are living honorable lives, and are abundantly able to care for their children. It seems self-evident that public policy and every consideration of humanity demand the restoration of these children to parental control" (Matter of Knowack, 158 NY 482, 488 [1899]).
Footnote 4: The concept of "permanency" originates from the federal Adoption Assistance and Child Welfare Act of 1980 (Pub L No. 96-272), which was enacted to deal with the problem of "foster care drift" (see H. R. Rep. No. 96-136 at 50 [1979] ["(M)any children, because of the inadequacies of current review procedures, and lack of family reunification services, become 'lost' in foster care, and continue to remain in care unnecessarily at great cost to the government, themselves and their families"]).

Footnote 5: See Justice Denied: Delays in Resolving Child Protection Cases in New York, 12 Va J Soc Pol'y & L. 546, 563 (2005) (describing the "pervasive delays" endemic to the New York Family Court system prior to 2005, and citing studies showing that New York ranked below the national standard for reunifying children with their families out of foster care).

Footnote 6: For example, the Act granted indigent parents the right to have appointed counsel and specified that the rules of evidence applied at hearings (id. § 1089 [d]).

Footnote 7: Federal law is silent as to whether parties can appeal a permanency order, and many states do not provide a right to appeal (see Josh Gupta-Kagan, Filling the Due Process Donut Hole: Abuse and Neglect Cases Between Disposition and Permanency, 10 Conn Pub Int L J 13, 29-32 [2010] [surveying state statutes and caselaw on the appealability of permanency hearing orders and finding that, as of 2010, "(a)t least twelve states plus the District of Columbia explicitly bar such appeals, three states bar them with narrow exceptions, thirteen explicitly permit them in at least some cases, () at least one state court has noted conflicting opinions within that jurisdiction," and "(t)he remaining twenty-one states do not have clear case law on point"]).

Footnote 8: In contrast, courts have generally held that the mootness exception applies to appeals of orders that changed permanency goals (and thus will review on the merits) (see e.g. Matter of Peter T., 173 AD3d 1046 [2d Dep't 2019] [reviewed only as to change of permanency goal from reunification to adoption]). A lonely anomaly to this pattern is Matter of Jolani P. (184 AD3d 574 [2d Dep't 2020], lv denied, 35 NY3d 911 [2020]), which, because of the pandemic and the Governor's tolling order of statutes of limitations for family court act proceedings, the subsequent permanency hearing could not be held before the appeal from the prior permanency appeal was decided, and the appeal was therefore not moot.

Footnote 9: The 2005 Permanency Bill, which transferred permanency hearings from Article 10 to the newly created Article 10-A, added a cross-reference to Article 10-A in Section 1121—clear evidence the Legislature intended the expedited appeal provisions to apply to permanency hearings (Senate Introducer's Mem In Support, Bill Jacket, 2005 S.B. 5805, Ch. 3, at 56). The 2005 Bill also added the requirements for expediting transcripts and directing the Departments to establish rules for the expedited filing of briefs (id.; see id. at 63 [noting in the context of termination appeals that the Bill would "eliminat(e) . . . obstacles that currently slow the appeals process"]). The majority's statement that "changes to the appellate process" aimed at expediting appeals are "more appropriately addressed through administrative or legislative means" (majority op at 10) overlooks the fact that the Legislature has already enacted such measures. It is the responsibility of courts to implement and ensure compliance with the Legislature's directives.

Footnote 10: See e.g. Justice Denied, supra n 4 at 548 (citing New York's election law system as an example of the state's ability to operate a "time sensitive" legal framework, and referencing Stoppenback v Sweeney [98 NY2d 431 (2002)], an election law case challenging the validity of a congressional petition, in which both the Appellate Division and Court of Appeals issued decisions on the merits—after briefing and argument—within just two weeks).

Footnote 11: The majority claims that Tameka "does not raise a systemic problem in the Family Court—such as consistent misinterpretation of a provision of the Family Court Act" (majority op at 8). I see no ambiguity in her argument that the "statutory right, however, is in almost every instance denied by a declaration of mootness by the Appellate Division," or that requiring courts to hear appeals of permanency orders extending foster care placement "is mandatory in order to effectuate the statutory right to appeal." 

Footnote 12: In response to Tameka's counsel stating the ultimate question was "whether [her] children should be returned," the referee interrupted, stating, "It's pre-disposition, Mr. Reed, so this Court would not be returning children pre-disposition to a parent. I don't have that authority today to do that, nor would I, not when there's a case pending before Judge Oliver . . . this is a pre-dispositional permanency hearing, so this Court would not be issuing that order today regardless of what I were to hear." Following the referee's statement, counsel explained that, "given the court's ruling," he would not present the proof he had intended to offer.

Footnote 13: See Justice Denied, supra n 4, at 570 ("[D]elay substantively affects the outcomes of child welfare cases in ways that it does not in other types of cases . . . Because children's lives are constantly evolving, their attachments and needs shift over time such that the ex ante best outcome can fall off the list of possible outcomes as time goes by. A child for whom the best result early in the case is to be returned to a parent who is the child's primary attachment figure may not have such an option later in the case. Later, the parent and the primary attachment figure often will no longer be the same person").

Footnote 14: The majority misunderstands my position in two ways. First, as to the March 2022 order, Tameka was not "prevented . . . from developing a record supporting why the children should be returned to her care" (majority op at 6), but rather, the error(s) impaired her ability to create a record useable in future proceedings to demonstrate that her children should be returned to her. Second, I do not contend she was "entitled to custody . . . for the purpose of developing a record" (majority op at 6). I merely propose that, in the context of an alleged error in failing to return a child to their parent, where the ultimate goal of return to parent remains unaltered, the court's error is not rendered moot in future proceedings because those future proceedings depend on the entire record, including the prior errors, which keeps the issue alive.

Footnote 15: Amici point to widespread problems with permanency hearings, including: "courts' failure to (1) comply with the statutory mandate to reunify children with their parents when continued placement is no longer necessary; (2) hold full evidentiary hearings, even when there are material issues in genuine dispute; (3) ensure that findings are made based on up-to-date and accurate information; (4) comply with statutory timelines; (5) consider the possibility of finding that the agency failed to make reasonable efforts to enable the child to return home; and (6) obtain consent from the parties before sending permanency hearings to referees to hear and determine." 

Footnote 16: See e.g. NYS Office of Children & Family Services, Office of Research, Evaluation and Performance Analytics, Disproportionate Minority Representation in Child Welfare Services Dashboard: 2023 & Five Year Trends (2024), https://ocfs.ny.gov/reports/sppd/dmr/Disparity-Rate-Packet-2023-Dashboard.xlsx (documenting racial disparities in the child welfare system in New York State); E. Jason Baron, Joseph J. Doyle Jr., Natalia Emanuel & Peter Hull, Unwarranted Racial Disparity in U.S. Foster Care Placement, National Bureau of Economic Research (Nov. 2024) ("Black children in the U.S. are twice as likely as white children to spend time in foster care").

Footnote 17: New York State Bar Association, Report and Recommendations of the Committee on Families and the Law Racial Justice and Child Welfare 6-7, 10 (Apr. 2022), https://nysba.org/app/ uploads/2022/03/Committee-on-Families-and-the-Law-April-2022-approved.pdf.

Footnote 1: Insofar as the majority concludes that a court must consider every colorable basis for invoking the mootness exception, I agree (see majority op at 7 n 3).

Footnote 2: "The plan may include a goal for adoption, a referral for legal guardianship, placement with a relative, or another living arrangement" (FCA § 1089 [c] [ii] - [v]).

Footnote 3: Mother also appealed these subsequent orders, although those are not before us here. Those orders, too, were mooted by another round of subsequent orders.

Footnote 4: The Attorney for the Child representing the younger of the two children argues that there should be a procedural distinction between a pre-disposition permanency hearing and a post-disposition permanency hearing, and that a pre-disposition permanency hearing does not substitute for the initial dispositional hearing. Furthermore, they argue that the permanency order was valid and a judicial exception to mootness is not warranted. Mother did not preserve this argument and thus whether this distinction matters cannot be considered on this appeal.

Footnote 5: To the extent that the Court has on rare occasion referred to the third factor in the disjunctive—"substantial or novel" (Maul, 14 NY3d at 507; Mental Hygiene Legal Serv. v Delaney, 38 NY3d 1076, 1091 [2022])—the correct articulation is that found in Hearst and the overwhelming majority of our decisions discussing the exception or citing Hearst (see e.g., Alcantara, 42 NY3d at 147; People ex rel. Johnson v Supt., Adirondack Corr. Facility, 36 NY3d 187, 195-196 [2020]; Gonzalez v Annucci, 32 NY3d 461, 470 [2018]).

Footnote 6: The majority misconstrues the second of these issues (see majority op at 7 n 3, 9 n 6). Whether a blanket mootness exception should apply to permanency orders is a substantial and novel question. That question is likely both to recur and to evade review so long as the Appellate Division determines the mootness of each appeal in isolation, as it did here. In answering that question, the Appellate Division might have concluded that a blanket exception was warranted, but only as to some (not all) permanency orders.

Footnote 7: Although the error occurred at least twice here, there is no general requirement of established repetition in the case on appeal, only a likelihood that the issue will recur in the future in some other case (see e.g. Codey on Behalf of State of N.J. v Capital Cities, Am. Broadcasting Corp., 82 NY2d 521, 527 [1993]; Coleman ex rel. Coleman v Daines, 19 NY3d 1087, 1090 [2012]). To the extent the majority suggests otherwise, the majority contradicts well-established precedent.

Footnote 8: While Article 10-A of the FCA outlines the permanency hearing process, DSS commenced the underlying Family Court neglect action under Article 10 (Merril Sobie, Practice Commentaries, McKinney's Cons Laws of NY, 2021 Electronic Update, FCA § 1089).

Footnote 9: Chief Judge Wilson, joined by Judge Halligan, similarly rejects the majority's argument from administrative convenience (see Wilson, Ch. J., dissenting op at 12-13). In so doing, the Chief Judge is guided, as I am, by the Legislature's intent of promoting family reunification (see id. at 5-6, 8-9).