Matter of King P. (James Q.) (2026 NY Slip Op 00173)

Matter of King P. (James Q.)

2026 NY Slip Op 00173

Decided on January 15, 2026

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:January 15, 2026

CV-24-0311
[*1]In the Matter of King P. and Another, Neglected Children. Montgomery County Department of Social Services, Respondent; James Q., Appellant, et al., Respondent.

Calendar Date:December 10, 2025

Before:Aarons, J.P., Reynolds Fitzgerald, Ceresia, Fisher and Corcoran, JJ.

Michelle I. Rosien, Philmont, for appellant.
Montgomery County Department of Social Services, Fonda (Jane Grounds of counsel), for Montgomery County Department of Social Services, respondent.
Vicki J. Prager, Northville, attorney for the child.
Bradley J. Rooke, Broadalbin, attorney for the child.

Corcoran, J.
Appeal from an order of the Family Court of Montgomery County (Michael Dayian, J.), entered January 29, 2024, which, in a proceeding pursuant to Family Ct Act articles 10 and 10-A, modified the permanency goal of the subject children.
Respondents James Q. (hereinafter the father) and Tia O. (hereinafter the mother) are the parents of a daughter and a son (born in 2017 and 2018, respectively). In September 2019, petitioner commenced a neglect proceeding against the father and the mother arising from a physical altercation between the father, the mother and another woman in the presence of the daughter and other children. Caseworkers documented a chaotic scene at the father's home and one of the children reported that the father struck one of the women with a chair. As relevant here, the petition alleged that the daughter's physical, mental and emotional conditions were impaired or at imminent risk of impairment, and she was removed on an emergency basis. Petitioner located the son in another county and documented multiple bruises. He was likewise removed, taken into petitioner's custody and placed in the same foster home as the daughter. At the time of the children's removal in 2019, the father resided in New York. Shortly thereafter, he relocated to South Carolina to live closer to his other children from a different relationship.
In August 2021, the father consented to a finding of neglect without admission and agreed to comply with a one-year order of supervision containing multiple terms and conditions.[FN1] The children remained in petitioner's custody throughout this period. In January 2023, petitioner filed a permanency hearing report which recommended continuation of the permanency goal of return to parent with a concurrent plan of placement for adoption. The permanency hearing commenced in January 2023, and continued over eleven dates between February and September 2023. By the end of the hearing, the children had been in foster care for nearly four years. Family Court issued a decision and order modifying the permanency goal from return to parent to free for adoption. The father appeals.
Initially, the father's argument that he was denied due process by the duration of the permanency hearing and the purported delay in Family Court's decision is unpreserved for our review. Even when a court does not strictly follow procedural protections, a party must still register an objection in order to preserve the claim for review (see Matter of Jemar H. v Nevada I., 182 AD3d 805, 808-809 [3d Dept 2020]; Matter of Telsa Z. [Denise Z.], 84 AD3d 1599, 1600 [3d Dept 2011], lv denied 17 NY3d 708 [2011]). Here, the record demonstrates that the father either failed to object or consented to all scheduled hearing dates. Assuming this issue was preserved, we would find no due process violation, as the permanency hearing involved scheduling the father's four out-of-state witnesses and the father's own interstate travel, thus good cause existed to extend beyond [*2]the statutory time limit (see Family Ct Act § 1089 [a] [3]; Matter of Anthony QQ., 48 AD3d 1014, 1015 [3d Dept 2008], lv denied 10 NY3d 714 [2008]).
Turning to the merits, the father contends that petitioner failed to make a sincere effort to reunify him with the children and that the hearing proof did not support a permanency goal of free for adoption. We disagree. "[A]t the conclusion of a permanency hearing, Family Court has the authority to modify an existing permanency goal and must enter a disposition based upon the proof adduced and in accordance with the best interests of the children" (Matter of Winter II. [Kerriann II.], 227 AD3d 1142, 1146 [3d Dept 2024] [internal quotation marks and citations omitted], lv denied 42 NY3d 903 [2024]; see Family Ct Act § 1089 [d]). "Wherever possible, the societal goal and overarching consideration is to return a child to the parent, and reunification remains the goal unless a parent is unable or unwilling to correct the conditions that led to removal" (Matter of Isayah R. [Shaye R.], 189 AD3d 1942, 1944 [3d Dept 2020] [internal quotation marks and citations omitted]). If petitioner establishes by a preponderance of the evidence that a return to the parent is impossible, "the goal then becomes finding a permanent, stable solution for the child[ren]" (Matter of Alexus SS. [Chezzy SS.], 125 AD3d 1141, 1143 [3d Dept 2015] [internal quotation marks and citation omitted]; see Matter of Isayah R. [Shaye R.],189 AD3d at 1944). The modification of a permanency goal will not be disturbed if the determination is supported by a sound and substantial basis in the record (see Matter of Joshua J. [Tameka J.], ___ NY3d ___, ___, 2025 NY Slip Op 03010, *4 [2025]; Matter of Gabrielle N. [Linda N.], 202 AD3d 1397, 1399 [3d Dept 2022]).
Here, the record reveals that petitioner provided the father with appropriate services to promote the goal of reunification. Petitioner referred the father to drug and alcohol treatment, domestic violence programming, anger management services and a parenting course, and then monitored his participation. Petitioner encouraged regular contact between the father and the children, arranged weekly in-person visits when he traveled to New York and coordinated telephone contact when in-person visits were not possible. When those telephone calls deteriorated, petitioner assigned a caseworker to remain on the calls to provide structure and continuity. Petitioner responded to the father's concerns about specific visitation locations, repeatedly scheduled supervised visits around his travel from South Carolina, and communicated with South Carolina's child-welfare agency to coordinate services there.
Despite those efforts, the father failed to comply with several terms and conditions of the one-year order of supervision. Among other requirements, the father was obligated to remain free from intoxicants within 24 hours of parenting time, provide verifiable proof of lawful employment and income, attend [*3]the children's medical appointments, refrain from criminal or violent activity, provide safe and age-appropriate supervision at visitations, and demonstrate a change in his behaviors that precipitated Family Court involvement in the first instance. The father completed substance abuse treatment, parenting programs, two domestic violence programs and two anger management programs. However, the hearing testimony also established that he arrived for a supervised visit emitting a strong odor of marijuana and later admitted that he had smoked marijuana within 24 hours before seeing the children. He engaged in criminal activity throughout the pendency of the case, prompting arrests in New York and South Carolina. He failed to substantiate legal income, provided shifting and unverified explanations of informal work and produced no tax returns, pay stubs, W-2s or other proof of lawful and stable means of support. He obfuscated his earning history, claimed to work as a food delivery driver despite a suspended driver's license, conceded that his grandmother consistently supported him financially, and provided scant, conclusory evidence that he supported his other children in South Carolina. When the son needed medical evaluation and treatment for a condition that ultimately resulted in a tonsillectomy, the father did not respond meaningfully to petitioner's repeated communications about those needs, nor authorize treatment. Petitioner ultimately obtained court authorization to proceed with the surgery. The father neither attended the procedure nor contacted the son after surgery.
The record is replete with evidence that the father failed to provide safe and age-appropriate supervision at visitations. On numerous occasions, the children ran from the supervised visitation area toward mall exits or a busy roadway without the father's effective intervention. On one such occasion, the father seized the son by the back of the neck to control him, prompting the daughter to yell, "don't choke him." Several of petitioner's staff members testified that visits routinely required the unusual need for multiple supervisors to maintain safety. The father expressed frustration or rejection toward his son, including when he stated, in the child's presence, "you can take that one back" and "you can parent that one, because I can't," while the child was crying and visibly upset.[FN2] While the father routinely brought gifts for the daughter, the son "very rarely" received anything. The father used corporal punishment during the visits, suggested to a caseworker that the children be sedated with melatonin, and ignored the children when he became frustrated, expecting the caseworker to assume the parental role. The father also failed to maintain regular contact with the children. During the two years before the commencement of the hearing, the father engaged in only 28 hours of in-person visitation, and his telephone contact was marked by missed calls, abrupt endings and deteriorating [*4]engagement. Notably, the father failed to attend any visits during a month when he was physically present in New York for Family Court appearances.
As Family Court noted, the father's testimony was rife with contradictions and evasive statements concerning his residence, employment, access to income and his recent interactions with the children. The court found the father's credibility was undermined by his sworn denial of any recent contact with the mother and appropriately viewed their continued association as a significant safety concern, as the domestic violence and criminal behavior arising from that relationship prompted the children's removal and imposition of the order of supervision in the first instance. The record demonstrated that, rather than distancing himself from this volatile relationship, the father was arrested with the mother in August 2022 and May 2023. Compounding this concern, the father denied that he had been with the mother during those incidents, a claim flatly contradicted by documentary proof admitted at the hearing.
According the requisite deference to Family Court's assessment of the father's credibility, and considering the proof of the father's noncompliance with the supervision order and the duration of the children's placement, we conclude "there is a sound and substantial basis in the record to support the modification of the permanency plan, and we discern no basis to disturb Family Court's determination" (Matter of Gabrielle N. [Linda N.],202 AD3d at 1400; see Matter of Dawn M. [Michael M.], 151 AD3d 1489, 1491-1492 [3d Dept 2017], lv denied 29 NY3d 917 [2017]).
Although the father primarily challenges the permanency goal, he also nominally contends that the children should have been returned to him. The same facts supporting the change in permanency goal, particularly the persistent safety and supervision concerns and the numerous violations of his order of supervision, also provide a sound and substantial basis for Family Court's conclusion that the children's best interests warrant their continued placement with petitioner and we discern no basis to disturb that determination (see Matter of Telsa Z. [Denise Z.], 84 AD3d at 1603).
Aarons, J.P., Reynolds Fitzgerald, Ceresia and Fisher, JJ., concur.
ORDERED that the order is affirmed, without costs.

Footnotes

Footnote 1: The mother never appeared at any stage of the case, and a neglect finding was entered upon her default.

Footnote 2: The father's witnesses generally described him as attentive and involved with his other children residing in South Carolina. However, none of those witnesses observed the father interact with the subject children, nor were they familiar with the safety concerns that arose during his supervised visitation in New York.